HENRY WYTUPECK, A MINOR, BY HIS FATHER AND GUARDIAN *AD LITEM*, JOHN WYTUPECK, AND JOHN WYTUPECK, IN HIS OWN RIGHT, PLAINTIFFS-RESPONDENTS, v. CITY OF CAMDEN, A MUNICIPAL CORPORATION, DEFENDANT-APPELLANT.

Argued October 21 and 28, 1957—Decided December 16, 1957.

*Mr. Norman Heine* argued the cause for appellant.

Mr. *Horace G. Brown* argued the cause for respondents (*Mr. Thomas F. Connery, Jr.,* on the brief; *Messrs. Brown, Connery, Kulp & Wille,* attorneys).

The opinion of the court was delivered by

HEHER, J. There was judgment for the plaintiffs on a jury verdict rendered in the Law Division of the Superior Court in this action for negligence in the condition and use of the defendant city's lands; and the case is here by our certification of the city's appeal to the Appellate Division of the Superior Court.

The basic question raised concerns the sufficiency of the evidence to sustain the finding of a breach of "duty owing" by the city to the infant plaintiff in these circumstances:

The mishap befell the infant May 15, 1954, on the city's lands comprising 14 acres plus, known as "Puchach Run," situate along Lenox Road and River Road, in the Delair section of Pennsauken Township, in Camden County, used by the city since 1924 for the maintenance and operation of five wells and water-pumping stations to supply the needs of its own inhabitants and residents, west of Cooper Creek. The well field was bounded on the north by River Road; on the east by Lenox Road; on the west by Delair and Engard Avenues; and on the south by a wooded area, and was, it seems to be conceded, "almost entirely surrounded by family residences of the townspeople." Four of the wells, numbered 1 to 4, were spaced along the easterly boundary of the tract, and No. 5 was located near the westerly boundary. Each of the wells was enclosed in a brick well house or pumping station. The Delair Elementary School was adjacent to the northwest section, across Delair Avenue. The field was not fenced or enclosed or "posted" against trespassing, and it had foot paths. The wells were operated by electric power, provided by a local power company through "high power lines" running along the outside boundary of the city's lands, and each of the well pumps was equipped with an outside "bank" of three transformers, to reduce the voltage of the high power lines to that required for the

operation of the well pumps. The transformers were adjacent to the well houses, enclosed by an eight-foot high steel "wire mesh or chain link fence with two inch diamond shape openings, commonly referred to as a 'cyclone' fence"; the fences were built on a "concrete platform supporting the transformers as well"; the "top of the fence had the sharply pointed ends of the wire projecting upwards," and on "each side of the fence ever since its erection were signs with 6 inch letters reading 'Danger—High Voltage'"; the chain link fence had a "top rail" and "2 inch mesh." The "only means" of ingress and egress to the transformers within the fenced or enclosed area "was through a gate which was always chained and locked."

Well house No. 1, the largest of the five, was used as an office for the pump attendants; it was located near River Road, the northerly boundary of the city's land; well No. 4, where the accident occurred, was situated at the southeast corner of the tract; the remainder of the land was "rough and unimproved including wooded areas"; adjacent on the east is a creek known as "Puchach Run"; there was a "sharp declivity, heavily wooded, running from the City's lands down to the Run," and the exhibits reveal a roadway along the easterly boundary providing "access to stations 2, 3 and 4." And there was evidence tending to show, using counsel's summary, that "[t]wo footpaths joined near the southeast end of the tract close to pumping station No. 4, which were used by infant plaintiff and others in entering on to defendant's premises at this point before continuing their journey past pumping station No. 4 and along the defendant's road or other routes on their way to Delair School or elsewhere"; that "[t]here were other foot paths across the field, used by the infant plaintiff, the City's pump tenders, townspeople and school children in the unrestricted use of the land," and this "unrestrained use extended in point of time as far back as 1924, when the wells were installed," and continued "up to the period when the accident occurred," and "embraced, in addition to pedestrian traffic, * * * recreational activities for the young and

old, such as playing baseball, fishing, picking blueberries, gunning, running dogs, hide-and-go-seek, tag, cowboys and indians" and the various games and diversions of children throughout the year according to season; there were two baseball diamonds, one used by "organized players" at an earlier time, and both on occasion later on by the infant plaintiff and other children for "small-fry baseball" in "close proximity" to pump house No. 4. A long-time resident near pump house No. 4, testified that "that was our playground."

The city concedes that there was evidence indicating that "some children living east of the Puchach Run, going to and from the Delair School situate to the West of the City's lands, would take a short cut through the woods across [its] land and near Well No. 4," and there "was also some testimony that in recent years a small group of children played occasionally in the open field to the west of Well No. 4"; but it is said that it was "established, without contradiction or dispute, that no one was ever known or seen to have played against or on the fence enclosing the transformer, or on the well house, or inside the fenced-in area"; and the insistence is that "[e]ver since the pumping stations were built and the transformers installed all the children knew the installation was dangerous," and in addition to the "warning signs they were warned by the City's employees, their parents or their playmates to stay away from the fences surrounding the transformers because they were dangerous and they might be hurt."

But the plaintiffs say that the fence "lacked the usual three-strand barbed wire extension set at a 45 degree angle on top, and was condemned by plaintiffs' expert engineering witnesses at the trial as dangerous, unsafe and inadequate, not being constructed in conformity with standard, accepted and recognized engineering practices," and the "signs 'Danger High Voltage' attached to the fence * * * were meaningless to the infant plaintiff, a third-grade school child, who did not know what 'voltage' meant or that there was electricity inside the fence."

While at play near pump house No. 4, with his younger brother and another boy, on the day named, Saturday, May 15, 1954, at about 7 o'clock in the evening, the infant plaintiff, then nine years of age, fashioned an "airplane" from a piece of paper he had received at school which finally glided within the wire enclosure containing the transformer and there came to rest, on the ground. He dissuaded his companions from climbing the fence, fearing a fall, and, bent on retrieving the lost plaything, he scaled the fence by hoisting himself upward through finger holds in the wire-mesh openings and, when he placed a leg over the top of the fence, preparing to descend into the enclosure, contact was made with an uninsulated wire joined to the transformer, charged with 4,000 volts of electricity, and he suffered grievous burns and injuries, of which more hereafter.

Motions for dismissal made when plaintiffs' proofs were in and at the close of the case were denied; and the jury assessed the infant plaintiff's damages at $150,000, and his father's damages *per quod* at $30,000, later reduced to $20,000 by Judge Martino on motion for a new trial. The award to the infant plaintiff was sustained.

## I.

The essence of the argument is that there is an utter lack of evidence of a default in the exercise of a "duty of care" laid upon the city in the circumstances; the infant plaintiff was a trespasser, and the injury "did not occur in the particular place or limited area which" it might be conceded "for the sake of argument was proved by the plaintiff to be the subject of constant trespassing," but rather "in a specifically confined area in which the defendant never discovered the plaintiff nor knew nor should have known of any previous trespass"; there was "no proof whatsoever of any play against the fence, on the fence, or over the fence, or even upon the well houses adjacent to the fence"; the place where the "condition is maintained is" not "one upon which children trespass or are likely to trespass"; trespassing on "the adjacent areas" of the city's land "outside

of the fenced-in area certainly cannot be said to be the same as trespassing inside the fence"; the accident here "did not occur in an unprotected area" of the city's "land which was the subject of previous trespassing or license," and "assuming the transformer and its connecting wires to be a dangerous agency," the city had enclosed it "with an 8 foot high cyclone fence which, to no one's knowledge to the contrary, had been a successfully complete barrier for thirty years"; it was "the child's irrepressible sense of bravado and his agility" that "moved him to climb over the 8 foot high fence placed there by the City to protect everyone, adults or children, from coming in contact with the dangerous agency" and, adverting to the duty of care "in proportion to the foreseeable risk," the question whether the city failed "to erect any or a sufficient barrier to exclude trespassing children from reaching the specific area in which the dangerous agency was maintained" must be answered in the negative.

"Foreseeable harm," it is insisted, "can only mean *reasonably probable* harm to occur in the future," citing *Guinn v. Delaware & Atlantic Telephone Co., 72 N. J. L. 276 (E. & A.* 1905); *James v. Wisconsin Power and Light Co., 266 Wis.* 290, 63 *N. W. 2d* 116 (*Sup. Ct.* 1954); "Foresight should not be measured by hindsight," citing *Melanson v. Reed Bros.,* 146 *Me.* 16, 76 *A. 2d* 853 (*Sup. Jud. Ct.* 1950); and the city was not required to "build its fence so that no person could climb over it," but merely "to exercise reasonable care to prevent trespassing children from being hurt by the dangerous condition,"—"to erect a reasonable barrier, to take reasonable precaution, to keep trespassing children out of the dangerous area."

But the witness Fishman, an electrical engineer of unquestioned experiential qualifications, testified that the particular "installation" did not conform to the "recognized standards in the industry * * * for the safeguarding of children and the public," in that (a) "there is no barbed wire on top of [the] fence," and (b) not sufficient "clearance between the fence and the live electrical parts"; the "heavily

charged" wires were "[m]uch too close" to the fence, and he emphasized the adverb; the "live parts of the bus on the right, which is the high voltage or high tension bus on that side of the fence * * * was somewhere in the order of fifteen inches"; the "opposite side, * * * somewhat closer, that was about ten inches"; and the "absolute minimum" distance for "voltages between 3,000 and 6,000, the horizontal clearance to apply there is given [by the Electrical Safety Code prepared by the United States Bureau of Standards] as 3 feet, six inches," and "[v]arious designers use clearances far beyond that," depending upon "engineering factors of safety"; the full housing of transformers is safer and feasible but more expensive than an outside fence enclosure, but a link or chain fence with two-inch mesh, such as was used here, can be made "acceptedly safe" for children, *i. e.,* reducing "the probability of accident happening," by a barbed wire extension placed on the fence top, and even more so if installed at a 45-degree angle; "an 8-foot cyclone fence that has [a] jagged edge is not sufficient"; it is not the height of the fence so much as the 45 degree angle, "in and out"; the use of barbed wire to this end has the sanction of long engineering practice, and its absence in such fencing of "electrical equipment" is "unsafe, unsound or dangerous."

Another witness of like qualification, Perry, affirmed that the installation was a "dangerous substation" for the want of a three barbed-wire fence extension at an angle of 45 degrees that "would exclude" climbing even by "unauthorized persons," and sufficient "clearance between the live parts and the fence," conforming to the National Safety Code, to protect "unauthorized persons" against the perilous consequences of high voltage electric current in scaling the fence. The mounted barbed wire offset arms had been "standard" and "accepted practice of the whole industry" for more than 30 years; that "was one of the earlier things that was considered in electric light and power industry, safety of substations."

The city's expert, Abplanalp, conceded that all such substations designed by him, save one, had the barbed wire

extension to make it "more difficult for children or anyone to get over the fence," a "requirement" of the "local power company" and "by reason of certain regulations."

And the photographic reproduction of the *locus* reveals a fence that might well be deemed woefully inadequate to bar the unknowing and unwary child, and not at all suggestive to a child of tender years of the grave danger that lurked behind.

While a sub-station such as we have here would cost at least $25,000, the requisite barbed-wire barrier could be had for but $75 or less.

Thus there was quite substantial evidence that the particular consequence of this deadly agency had long been foreseen by the industry itself and had evoked preventive measures proved by experience that were not taken here.

 The possessor of land is liable for the reasonably foreseeable injurious consequences of the use of a dangerous agency on the land. Where the use of the instrumentality on the land would be highly dangerous to the personal safety of others, the common law raises a "public duty" of care commensurate with the risk of harm. *Strang v. South Jersey Broadcasting Co.*, 9 *N. J.* 38 (1952). The principle is founded in the fundamental social, moral and ethical policy, *Van Winkle v. American Steam-Boiler Co.*, 52 *N. J. L.* 240 (*Sup. Ct.* 1890), Beasley, C. J., that "hedges round the lives and persons of men with much more care" than is given to the guarding of their property, "so that, in this particular [the law] makes, in a way, everyone his brother's keeper; and therefore it may well be doubted whether in any supposable case redress should be withheld from an innocent person who has sustained immediate damage by the neglect of another in doing an act which, if carelessly done, threatens, in a high degree, one or more persons with death or great bodily harm"; "Such misfeasances, if they result fatally, are indictable crimes"; and "Where they inflict particular damage upon individuals they should, it is conceived, be actionable." One may not do for his own benefit

or pleasure that which, in its natural consequence, will substantially invade the equal rights of another.

Said Justice Swayze in *Guinn v. Delaware & Atlantic Telephone Co., supra,* cited by appellant, "a person is liable for those results of his negligence which are reasonably to be anticipated," and the "test of the defendant's liability to a particular person is whether the injury to him ought reasonably to have been anticipated." There, defendant's guy wire, stretched over an open field, across which people were accustomed to travel without objection by the landowner, fell to the ground while in contact with a live electric wire, and the plaintiff, a boy of 13, was killed; a recovery was sustained on the ground that it "was probable that, if the guy wire broke some one crossing the field would come in contact with it," and it could not avail the defendant that "whoever did so was a trespasser or bare licensee, as against the landowner," for if a "bare licensee, he would still be there lawfully," and if a "trespasser, his wrong would be to the landowner alone, not a public wrong, nor a wrong to the defendant." It was pointed out that the landowner's exemption from liability as to "trespassers and licensees" was designed to "secure him the beneficial use of his land," and there was no reason for extending the exemption to the case where "the rights of the defendant have not been interfered with."

"Duty" is not an abstract conception; and the standard of conduct is not an absolute. Duty arises out of a relation between the particular parties that in right reason and essential justice enjoins the protection of the one by the other against what the law by common consent deems an unreasonable risk of harm, such as is reasonably foreseeable, *Lokar v. Church of the Sacred Heart,* 24 *N. J.* 549 (1957). In the field of negligence, duty signifies conformance "to the legal standard of reasonable conduct in the light of the apparent risk"; the essential question is whether "the plaintiff's interests are entitled to legal protection against the defendant's conduct." *Prosser on Torts* (*2d ed.*), *section* 36. Duty is largely grounded in the

natural responsibilities of social living and human relations, such as have the recognition of reasonable men; and fulfillment is had by a correlative standard of conduct.

In the much-mooted case of *Palsgraf v. Long Island Railroad Co.*, 248 *N. Y.* 339, 162 *N. E.* 99, 59 *A. L. R.* 1253, 1263 (*Ct. App.* 1928), a 4-3 division, Cardozo, C. J., said that negligence is not actionable "unless it involves the invasion of a legally protected interest, the violation of a right"; "negligence" is the "absence of care, according to the circumstances"; the "ideas of negligence and duty are strictly correlative," citing Bowen, L. J. in *Thomas v. Quartermaine*, 18 *Q. B. D.*, 685, 694, 56 *L. J. Q. B.* 340 (1887); negligence, like risk, is "a term of relation," and in the abstract, "apart from things related, is surely not a tort, if indeed it is understandable at all"; negligence is not a tort "unless it results in the commission of a wrong, and the commission of a wrong imports the violation of a right"; negligence involves, he reasoned, a relation between the parties, founded upon the foreseeability of harm to the person in fact injured.

But Andrews, J., for the minority, declared:

"Due care is a duty imposed on each one of us to protect society from unnecessary danger, not to protect A, B or C alone. * * * Everyone owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others. * * * Not only is he wronged to whom harm might reasonably be expected to result, but he also who is in fact injured, even if he be outside what would generally be thought the danger zone."

"Duty" is not a rigid formalism according to the standards of a simpler society, immune to the equally compelling needs of the present order; duty must of necessity adjust to the changing social relations and exigencies and man's relation to his fellows; and accordingly the standard of conduct is care commensurate with the reasonably foreseeable danger, such as would be reasonable in the light of the recognizable risk, for negligence is essentially "a matter of risk * * * that is to say, of recognizable danger of injury." *Prosser, Ibid., section* 30.

And these considerations of social justice in our more complex human relations have made for exceptions to the general rule of the landowner's nonliability to trespassing save for acts willfully injurious. *Imre v. Riegel Paper Corporation,* 24 *N. J.* 438 (1957).

The given standard of care is operative in favor of trespassers on land if the presence of the particular trespasser be discovered, or the possessor of the land be aware of constant trespassing upon a particular place or a limited area and the act is likely to cause death or serious bodily harm. *Strang v. South Jersey Broadcasting Co., supra; Imre v. Riegel Paper Corporation, supra.*

*Section* 335 of the *Restatement* renders a possessor of land who knows, or from acts within his knowledge should know, of constant intrusions by trespassers upon a limited area of the land, liable for their bodily harm ensuing from an artificial condition on the land created or maintained by the possessor, and the condition is, to his knowledge, likely to cause death or serious bodily harm to such trespassers and is of such a nature that he has reason to believe that such trespassers will not discover it, and the possessor has failed to exercise reasonable care to warn such trespassers of the condition and the risk involved; and this rule applies not only to adult trespassers but to children as well.

And *section* 339 of the *Restatement,* hailed by Dean Prosser as "its most successful single achievement," covers in particular trespassing children of tender years who because of immaturity are wanting in the discretion and judgment essential to their own security. Where the trespass upon the land is foreseeable, and the condition involves an unreasonable risk of death or serious bodily harm to the trespassing child, the possessor of the land is liable. Habitual acquiescence in trespasses may well constitute license; tolerance may be so pronounced as to be tantamount to permission. *Imre v. Riegel Paper Corporation, supra.*

Here, the city's lands were long used as a play- and recreation-ground, by adults and children of all ages; and so the presence of the infant child upon the land was within

the realm of reasonable prevision, and from this circumstance derives the duty of care and protection commensurate with the foreseeable risk of harm.

Liability here rests upon the foreseeability of harm to the child; it proceeds upon the ground that the trespass is to be foreseen, and the defendant's "active and dangerous conduct places upon him the obligation to use care for the safety of other human beings." *Prosser, Ibid., section* 76.

As said in *Strang,* the rule proceeds from humanitarian considerations and reasons of social policy. It represents a prudent and essential accommodation of the landowner's right to the use of his land and society's interest in the humane and the protection of the life and limb of its youth and the individual's interest in personal security. The correlative burden on the landowner, small indeed in comparison to the larger interests to be served, is a necessary concession to the common welfare. Human safety is of far greater concern than unrestricted freedom in the use of land. The particular relation gives rise to a legal duty commensurate with the demands of reasonable foresight for harm.

The infant plaintiff was unaware of the danger, or so the jury could have found, as it undoubtedly did find; the fence was so constructed as to permit of easy ascent by a nine-year old boy. Children have an innate urge to climb, and to explore and to achieve; and, as we pointed out in *Strang,* parents cannot be with their children always.

The ruling principle does not necessarily involve the element of allurement. See *Bartleson v. Glen Alden Coal Co.,* 361 *Pa.* 519, 64 *A.* 2d 846 (*Sup. Ct.* 1949).

The case is well within the established principles of responsibility for a reasonably foreseeable risk; there were issues of fact for the jury involving fulfillment of the prescribed duty, and the verdict on the issue of liability was not contrary to the weight of the evidence.

And there was no harmful error in the charge or in the refusal to charge, related to the foregoing principles and the context of the instructions as a whole.

## II.

It is insisted that the "excessive verdicts" should be set aside as "the result of mistake, passion, prejudice or partiality."

The infant sustained muscle destruction in the right leg, abdomen and thoracics; and the leg was amputated "in the upper third of the thigh, above the burned area"; there were severe third-degree burns of the chest from the collarbone to a point just below the umbilicus, and the left wrist and thumb, and also in the right groin, exposing the testicles; burns of the left hand necessitated amputation of the thumb; the abdominal burns exposed the peritoneum; and three ribs were removed as the result of burns. Numerous skin and tissue-grafting operations were required. He was hospitalized from May 15, 1954, the day of the accident, until June 8, 1955, except for a short stay at home during the Christmas holidays. More operations were required during the latter half of this period, including the removal of a "bulge" in the abdomen where the muscles had been burned away, and the substitution of a piece of wire mesh for the destroyed muscle tissue.

The boy is permanently mutilated and disabled, so much so as to be unemployable at work calling for manual labor, if indeed employable at all. He has extensive disfiguring scars, and he suffered a considerable loss of tissue and muscle. The surgeon testified that "the stump that this boy has is one that is forced upon us, so it gets little hip articulation of hip prosthesis"; "hip prostheses are not satisfactory, they cannot walk or manipulate them as well as the mid-thigh, or lower-third thigh amputation with prostheses, and they create quite a decided limp when they are used, as compared to the others; they are uncomfortable as they sit on them so much; because of their location, they sit on a part of the prothesis instead of on the thigh and buttocks." And his left hand is 90% disabled. We need not dwell on the personality and psychological changes, the everlasting depres-

sion of morale and spirit, consequent upon these grevious and ravaging injuries.

The appellate tribunal cannot invade the constitutional office of the jury; it may not merely weigh the evidence where it is fairly susceptible of divergent inferences and substitute its own judgment for that of the jury; there may be judicial intervention only if the verdict is so far contrary to the weight of the evidence as to give rise to the inescapable conclusion of mistake, passion, prejudice, or partiality. *Hager v. Weber, 7 N. J.* 201 (1951).

A verdict of $350,000 awarded a 34-year old workman "for permanently disabling injuries caused by a severe electric shock" was recently sustained by the Federal Circuit Court of Appeals, in *Lebeck v. William A. Jarvis, Inc.,* 250 *F. 2d* 285 (3 *Cir.* 1957). The standard governing the trial judge in such inquiries was held by Judge Hastie to be whether the jury's verdict "could rationally and dispassionately be reached by laymen on the basis of the evidence relevant to the several categories of legally recoverable damage," a form of judicial control "over arbitrary action in fact finding."

So assessed, the verdict for the infant is unassailable; and the parent's verdict, so reduced, does not transcend the bounds of reason. The medical expenses incurred and paid amount to $9,155.65; and the cost of future repair and replacement of the child's artificial leg, during his minority, was placed at $1,800, a total of almost $11,000. The allowance otherwise is not such as to justify appellate intervention. *Salvato v. New Jersey Asphalt & Paving Co.,* 135 *N. J. L.* 185 (*E. & A.* 1947).

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS and FRANCIS—6.

*Opposed*—None.