**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2126-16T4

G.A.-H.,

       Plaintiff-Appellant/
       Cross-Respondent,

    v.

K.G.G.,

       Defendant,

    and

A.M.,

       Defendant-Respondent/
       Cross-Appellant,

    and

GEM AMBULANCE, LLC,[1] and LAKEWOOD
S.C. UNITED,

       Defendants-Respondents,

    and

MONMOUTH OCEAN SOCCER ASSOCIATION
a/k/a MOSA, JERSEY SHORE BOCA, and
JERSEY SHORE BOCA JR FC LEAGUE,

       Defendants.

> **APPROVED FOR PUBLICATION**
>
> **June 22, 2018**
>
> **APPELLATE DIVISION**

_____

Argued May 15, 2018 — Decided June 22, 2018

Before Judges Fisher, Fasciale and Natali.

_____

[1] Improperly pleaded as GEM Ambulance and GEM TRANS.

On appeal from Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-0418-15.

Ramon M. Gonzalez argued the cause for appellant/cross-respondent (Gonzalez & Caride, attorneys; Ramon M. Gonzalez and Robert M. Mayerovic, on the briefs).

Frances Wang Deveney argued the cause for respondent/cross-appellant (Marks, O'Neill, O'Brien, Doherty & Kelly, PC, attorneys; Frances Wang Deveney, of counsel; Sophia G. Tyris and Shannon B. Adamson, on the briefs).

George R. Hardin argued the cause for respondent GEM Ambulance, LLC (Hardin, Kundla, McKeon & Poletto, PA, attorneys; George R. Hardin, of counsel; George R. Hardin and John R. Scott, on the briefs).

Mitchell S. Berman argued the cause for Philadelphia Indemnity Insurance Company[2] (Mitchell S. Berman LLC, attorney; Mitchell S. Berman, on the brief).

Shiraz Imran Deen, Assistant Prosecutor, argued the cause for respondent Ocean County Prosecutor's Office (Joseph D. Coronato, Ocean County Prosecutor, attorney; Samuel Marzarella, Chief Appellate Attorney, of counsel; Shiraz Imran Deen, Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

---

[2] Lakewood S.C. United, to the extent it may be a juridical entity, has not appeared. Counsel retained by Philadelphia Indemnity Insurance Company has appeared in both the trial court and here to argue against the reinstatement of plaintiff's claim against Lakewood S.C. United.

In this appeal, we examine whether tort liability may be imposed when one remains silent and fails to warn a victim or alert authorities despite knowledge or a reason to suspect that a co-worker has engaged in the sexual abuse of a minor. In our view, the common law does not necessarily preclude the imposition of such a duty. Ultimately, that issue must await further development of the facts surrounding the relationship between the abuser and his co-worker, as well as the facts regarding the co-worker's awareness of the abuse that was unduly limited by the trial judge's failure to permit plaintiff discovery of evidence in the prosecutor's possession.

This matter has its genesis in an emergency medical technician's unlawful sexual relationship with plaintiff G.A.-H. (Georgia), who was then fifteen years old. Having already obtained a default judgment against that EMT — defendant K.G.G. (Kenneth), who was criminally convicted and is now incarcerated — Georgia seeks damages against the remaining defendants: A.M. (Arthur), another EMT who worked with Kenneth; GEM Ambulance, LLC, their employer; and Lakewood S.C. United, a recreational soccer club alleged to have created an opportunity for the illicit relationship

to occur.[3] In the proceedings that followed, the trial judge: (1) limited or precluded Georgia's pursuit of discovery from the Ocean County Prosecutor; (2) granted summary judgment to both Arthur and GEM; and (3) denied Georgia the opportunity to reinstate her claim against Lakewood S.C. United that had been administratively dismissed. We either reverse or vacate these rulings and remand for further proceedings in all respects.[4]

I

We need only briefly discuss Georgia's arguments regarding the judge's decision not to require a turnover or even an in camera review of materials gathered by the prosecutor during a criminal investigation that led to Kenneth's conviction. In a series of orders, the judge concluded that Georgia failed to provide sufficient evidence of a sustainable claim against Arthur to warrant further discovery from the prosecutor of explicit images of Georgia that were in Kenneth's possession and that may have

---

[3] The names we have used for the involved individuals are fictitious.

[4] Arthur filed a cross-appeal, arguing the judge erred by denying him frivolous litigation fees from Georgia. In light of our disposition of the other issues, we affirm the order denying Arthur's motion for fees and sanctions.

been viewed by Arthur.[5] The judge similarly denied Georgia the opportunity to examine videotaped statements made by Arthur to police; these particular materials may have been reviewed by the judge in camera — the record is not clear to us — but we can locate in the record no stated rationale for the judge's decision denying access to this information to the victim of the crime.

The prosecutor has expressed to us a willingness to turnover relevant materials so long as the trial judge remains involved and controls further dissemination. With entry of an appropriate protective order, the prosecutor may be assured that the sensitive materials in his possession will not be disseminated beyond what is necessary to allow the victim of the crime to prosecute this civil action. Consequently, we reject Arthur's opposition[6] to the turnover of any further evidence in the prosecutor's possession. And we find insufficient merit to warrant further discussion in

---

[5] The significance of this evidence cannot be understated when considering Georgia's factual contentions that Arthur should have been aware of Kenneth's unlawful activities. She contends that the forty-four-year-old Kenneth: bragged to Arthur and others about sleeping with a "much younger" female; showed Arthur and others images on his cellphone that were "something other than soft pornography"; and provided differing statements about the girl's age. It is claimed that the images that were on the cellphone depicted "a young adolescent . . . inherently [of] an age where full development ha[d] not occurred."

[6] Arthur's opposition has been more forceful than the prosecutor's expressions of concern.

this opinion, R. 2:11-3(e)(1)(E), in the argument that a turnover of these materials would violate the Adam Walsh Act, N.J.S.A. 2C:24-4(b)(5)(a), which criminalizes receipt of child pornography, or that a turnover would cause additional injury to the victim of the crime. We cannot imagine the Legislature intended to frustrate a victim's pursuit of a civil remedy by invoking the very laws designed to protect her.

We reverse the orders that foreclosed this discovery and remand for an in camera review of the materials sought, as well as the judge's further consideration of Georgia's discovery requests, particularly in light of our reversal of the summary judgments entered in favor of Arthur and GEM, to which we now turn.

II

In granting summary judgment in Arthur's favor, the motion judge found Georgia's factual version insufficient to support a claim that Arthur was or should have been aware of Kenneth's criminal conduct. He also concluded that the law imposed no duty on Arthur to warn, to contact authorities, or to contact the employer about his co-worker's conduct. Because we have concluded that the judge mistakenly curtailed Georgia's efforts to obtain discovery from the prosecutor, there is no point in presently

considering the sufficiency of the evidence adduced to date, although we also believe that the judge failed to view that evidence in the light most favorable to Georgia as required. <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 N.J. 520, 540 (1995). The facts marshalled to date, <u>see</u> n.5, as well as other information that provided further reasonable inferences,[7] likely generated factual disputes about the extent of Arthur and GEM's knowledge of Kenneth's activities to warrant denial of their summary judgment motions. We instead focus on the fact that the judge also granted summary judgment because he believed neither Arthur nor GEM owed Georgia a tort duty in these circumstances. Our response to that determination warrants a closer look and more extensive discussion.

In opposing summary judgment, Georgia largely relied on what she claims was a duty based on N.J.S.A. 9:6-8.10, which requires that "[a]ny person having reasonable cause" to believe a child has been abused "shall report the [abuse] immediately to the Division of Child Protection and Permanency." We agree with the motion judge that this obligation arises when a person has reasonable cause to believe a child has been subjected to child abuse within

---

[7] For example, Georgia offered evidence to suggest that Kenneth would walk her to a bus stop in the morning while co-workers were in an ambulance parked nearby.

the meaning of only Title Nine. Thus, the child abuse that gives rise to this reporting obligation concerns abuse arising from the acts or omissions of only a child's "parent, guardian, or other person having [the child's] custody and control." N.J.S.A. 9:6-8.9. These statutes imposed no duty on Arthur to report to the Division whatever he might have known about Kenneth's relationship with Georgia because Kenneth was not Georgia's parent or guardian or a person "having [her] custody or control." We agree with the trial judge that Title Nine imposed no duty on Arthur or GEM to advise the Division of Kenneth's abuse of Georgia.

But that holding does not dispense with the possibility that the common law might impose such a duty. Although not originally relied upon by Georgia, we find this possibility may emanate from J.S. v. R.T.H., 155 N.J. 330, 334 (1998), where our Supreme Court held that "a wife who suspects or should suspect her husband of actual or prospective sexual abuse of their neighbors' children has [a] duty of care to prevent such abuse."[8]

In considering whether a similar duty may be imposed on a co-worker, we start by first rejecting Arthur's argument that this

_____

[8] Georgia did not rely on J.S. in the trial court nor in her written submissions here. We raised it at oral argument and requested — and have since received — all parties' supplemental briefs about whether J.S. might or should be expanded to cover this situation.

case is not the same as J.S. and that J.S. consequently has no bearing here. To be sure, the abuser and the defendant in J.S. had a different relationship than did defendant and Arthur. But that difference should not end our inquiry. The common law did not suddenly rest after evolving over a thousand years. It forever progresses to meet an ever-changing society's needs; as some concepts whither and some die, others emerge and ripen. See Schwartz v. Accuratus Corp., 225 N.J. 517, 527 (2016) (observing that "the evolution of case law must reflect the simultaneous evolution of societal values and public policy"). What constitutes a duty doesn't rise up from "a simpler society['s]" "rigid formalism[s]"; this process necessarily "adjust[s] to the changing social relations and exigencies and . . . [the individual's] relation[s] to [others]." Wytupeck v. Camden, 25 N.J. 450, 462 (1957). Considering whether J.S. should be viewed as the place where the reach of such a duty stops or marks only a starting point requires a deeper analysis of J.S. itself and its expressions of policy in determining whether our Supreme Court anticipated or laid the groundwork for a further expansion beyond the duty it imposed on spouses.

In undertaking that examination, we commence by heeding Justice Handler's observation that the process is "rather complex" in that it warrants a weighing and balancing of "several, related

A-2126-16T4

factors, including the nature of the underlying risk of harm, that is, its foreseeability and severity, the opportunity and ability to exercise care to prevent the harm, the comparative interests of, and the relationships between or among, the parties, and, ultimately, based on considerations of public policy and fairness, the societal interest in the proposed solution." J.S., 155 N.J. at 337. The Supreme Court later enumerated these same factors in Schwartz, holding that the decision to impose a tort duty must include a consideration of: "(1) the relationship of the parties, namely the relationship between plaintiff and defendant; (2) the nature of the attendant risk . . . ; (3) the opportunity and ability to exercise care; and (4) the public interest in the proposed solution." 225 N.J. at 523-24. See also Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993). This process always poses "a question of fairness." Goldberg v. Housing Auth., 38 N.J. 578, 583 (1962).

In considering these factors, we view the "nature of the attendant risk" when compared to "the opportunity and ability to exercise care," Schwartz, 225 N.J. at 523-24, to more than fairly support the imposition of a duty. The risk — child abuse — is great, while the exercise of care — a call to another (the Division, the police, or the employer) — imposes a small burden on a co-worker with sufficient knowledge. See Juarez v. Boy Scouts

10

of Am., Inc., 97 Cal. Rptr. 2d 12, 33 (Ct. App. 2000) (observing a "common goal of safeguarding our children, our chief legacy, . . . [that] is gravely threatened by sexual predators").

The more difficult issue concerns the scope of the relationship between the abuser and the targeted defendant. The Supreme Court recognized that "whether there is a 'duty' merely begs the more fundamental question whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." Weinberg v. Dinger, 106 N.J. 469, 481 (1987) (quoting W. Prosser, Handbook of the Law of Torts § 53 at 325 (4th ed. 1971)); see also J.S., 155 N.J. at 338. This involves an understanding of the parties' relationships and the extent to which the defendant had access to or otherwise possessed knowledge of the abuser's conduct sufficient to justify the imposition of a duty to act. In J.S., the abuser and the defendant were married. We readily reject Arthur and GEM's contention that the buck must stop there.[9] There are no doubt other types of relationships,

---

[9] We are mindful of the general principle that "[a]n actor whose conduct has not created a risk of physical or emotional harm to another has no duty of care to the other." Restatement (Third) of Torts, § 37 (Am. Law Inst. 2012). But that principle — broadly distinguishing between misfeasance and nonfeasance — often gives way when a particular relationship exists between the actor and the other justifying the imposition of a tort duty. Id. at § 40. While the acts or omissions of Arthur or GEM may not have generated the risk that caused harm to Georgia, a duty of care may

A-2126-16T4

including those who have worked together for a sufficiently reasonable amount of time and intensity, that would be adequate to fairly warrant the imposition of a duty to act.[10]

And requiring one to speak or act even if that one was not the cause of a risk of harm to another is not inconsistent with the expectations of present-day society. Citizens are urged to speak out about their suspicions: "if you see something, say something."[11] Although speaking in terms limited to child abuse within the meaning of N.J.S.A. 9:6-8.10, which we have found inapplicable here, that statute nevertheless evokes a public policy that citizens ought not remain silent when aware of child abuse. Extrapolating from such expressions of public policy, the J.S. Court recognized an extensive duty to report child abuse that isn't limited to "professionals, such as doctors, psychologists, and teachers" but "required of every citizen." 155 N.J. at 343. To be sure, the Court imposed that duty when considering the

---

nevertheless be imposed, depending on the quality, nature, and extent of their relationship to Kenneth.

[10] See Juarez, 97 Cal. Rptr. 2d at 35, where the court opened the possibility of imposing a duty on the Boy Scouts of America to warn of or prevent abuse committed by its volunteers.

[11] A federal agency — the Office of Homeland Security — has been conducting a national campaign that urges citizens to raise their awareness of terrorism indicators. See Homeland Security, If You See Something, Say Something, https/www.dhs.gov/see-something-say-something (last visited June 8, 2018).

nonfeasance of a spouse; we cannot, however, conclude it is against public policy to expand the scope of a duty to warn in such matters in the absence of a spousal relationship.

Of course, recognizing a policy in favor of action is one thing. The process of imposing tort liability when a person fails to so act requires a further leap. Unfortunately, before taking that jump, we require a better understanding of what Arthur knew and when he knew it, as well as the extent of his relationship with Kenneth, all of which was precluded by the limitations the judge placed on the turnover of evidence from the prosecutor and by his premature grant of summary judgment. Consequently, we cannot presently say whether a duty to act ought to be imposed on Arthur or, for that matter, on GEM.[12] The record reveals far too little about the extent of his relationship to Kenneth or whether whatever he learned from Kenneth's braggadocio or Arthur's own observations justify the imposition of a tort duty.

We therefore vacate the summary judgments entered in favor of Arthur and GEM, and remand for further proceedings.

---

[12] The disposition of Georgia's claim against GEM must also await a fuller understanding of what GEM's employee, Arthur, knew and whether either company policy or the common law duty that might be appropriate to impose on Arthur further implicates GEM.

Georgia commenced this action in February 2015; she included within her complaint a claim against an entity referred to as Lakewood S.C. United (United). She asserted that Kenneth, who was somehow affiliated with United, hired her to serve as a manager of its teenage traveling soccer club and, as a result, an employment relationship came into being that imposed a duty on United to warn of what eventually occurred between Kenneth and Georgia.

By August, service of process had not been effected on United, resulting in an administrative dismissal of that part of the complaint. That dismissal appears to have been set aside by way of an order entered the following month.

Georgia moved in February 2016 for leave to effect service by publication. That motion was denied in March; the judge determined that personal service should be made on United's alleged principal. In a May 2016 motion, Georgia's counsel asserted that service had been effected on United's principal in Lakewood. Counsel for Philadelphia Indemnity Insurance Company specially appeared and asserted that this delivery was insufficient because the individual to whom the papers were handed was the aunt of United's alleged principal. On July 8, 2016, the judge entered an

order — without explanation — that refused to vacate the dismissal of the action against United.[13]

Because the motion judge failed to explain the ruling contained in his July 8, 2016 order, as required by Rule 1:7-4(a), see Gnall v. Gnall, 222 N.J. 414, 428 (2015); Curtis v. Finneran, 83 N.J. 563, 569-70 (1980), we do not know why the server's handing over of the summons and complaint to the aunt of United's alleged principal was insufficient.[14] We also do not know whether the judge concluded that Georgia's counsel had failed to act diligently. Nor is it clear that a further opportunity to effect service of process was foreclosed by that last order on this subject.

These unanswered questions are reason enough to permit further trial court proceedings on this subject. In considering any further efforts to establish either that service on the aunt was sufficient or that service at some other place or in some other manner is warranted, we would remind the motion judge that reinstatement after an administrative dismissal "is ordinarily routinely and freely granted" once the problem that led to

---

[13] It is not clear to us why an earlier order suggested that the administrative dismissal had been vacated while this later order suggested the contrary.

[14] Counsel for the insurer asserted that the aunt advised that the individual in question "floats around" and, therefore, that her home is not necessarily the alleged principal's residence.

A-2126-16T4

dismissal has been cured. <u>Rivera v. Atl. Coast Rehab. & Health Care Ctr.</u>, 321 N.J. Super. 340, 346 (App. Div. 1999); <u>see also</u> <u>Ghandi v. Cespedes</u>, 390 N.J. Super. 193, 196 (App. Div. 2007). We vacate the July 8, 2016 order and remand for further consideration of the issues we have posed, as well as for any other proceedings necessary to allow Georgia to further pursue any claim she may possess against United.

* * *

For all these reasons, we reverse the orders that denied further discovery from the prosecutor, we vacate the orders granting summary judgment in favor of both Arthur and GEM, and we vacate the last order regarding service on United. We remand for further proceedings regarding all these issues in conformity with this opinion.

We also find no merit in the issue raised in Arthur's cross-appeal — that the judge erred by denying his motion for frivolous litigation fees — because, for the reasons expressed in our disposition of Georgia's appeal, Georgia's claims against Arthur are "supported by a good faith argument for an extension . . . of existing law." N.J.S.A. 2A:15-59.1(b)(2). The order that denied Arthur's motion for sanctions and fees is therefore affirmed.

We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2126-16T4