51 N.J. Super. 123 (1958)
143 A.2d 844
ROY ALLEN HEALING, AN INFANT BY HIS GUARDIAN AD LITEM JOAN HEALING, AND JOAN HEALING, PLAINTIFFS-RESPONDENTS,
v.
SECURITY STEEL EQUIPMENT CORP., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 16, 1958.
Decided July 2, 1958.
*125 Before Judges PRICE, HANEMAN and SCHETTINO.
Mr. Robert N. Wilentz argued the cause for plaintiffs-respondents (Mr. Mathias D. Dileo, of counsel; Messrs. Wilentz, Goldman, Spitzer & Sills, attorneys).
*126 Mr. John C. Stockel argued the cause for defendant-appellant.
The opinion of the court was delivered by SCHETTINO, J.A.D.
Defendant appeals from a final judgment entered on a jury's verdicts and from an order denying a new trial by the County Court. Defendant asserts as errors the trial court's refusal to grant its motions for judgment which were made at the close of plaintiffs' case and of the entire case, and also the trial court's refusal to set aside the judgment entered upon the verdicts on the grounds that the verdicts were against the weight of the evidence and were the result of mistake, partiality, prejudice or passion.
This is a personal injury case involving an infant plaintiff. Defendant-appellant's manufacturing plant is located adjacent to a public playground. The plant property is surrounded by a heavy steel wire mesh fence of the cyclone type which is seven or eight feet high. There is a triangular-shaped hole in the base of the cyclone fence about four feet high and three feet long. It is large enough to admit the passage of an adult. The hole has been used for some time as a means of ingress and egress from the premises of defendant by its employees and as a short cut by said employees and by strangers.
The playground was established approximately five years before the incident. Prior to that time, the situs of the playground was an open field in which children played. Although the testimony is conflicting, the jury could have found that the hole was in existence before the playground was built. A baseball or softball diamond was constructed on the playground close by the hole. The hole has been often used over a period of years by children as a means of ingress and egress to the premises of defendant when it was necessary to retrieve baseballs which had been batted over the fence. Such use was made by children many times during the course of baseball games which occurred almost every day. Testimony was submitted that children from the playground also went on to defendant's buildings and were chased by defendant's *127 employees only when they climbed over boxes, tables and other things. At times children would take defendant's waste materials from its premises and would use them for stuffing their baseball gloves.
The incident complained of by plaintiffs allegedly occurred on Monday, April 30, 1956. Defendant's witness testified that usually on Saturdays its employees used a solution of 50% nitric acid to cleanse certain of its equipment. This work was done on a platform located at the front of defendant's plant and adjacent to the playground. On the day of the alleged accident to the infant-plaintiff, an earthenware crock containing a 50% solution of nitric acid was standing upon the platform in the location described above.
Defendant admits that on Monday, April 30, 1956, one of its employees saw the infant plaintiff crying on its premises, that the boy had come in contact with a vat of acid or other material which was open and on its premises, that the vat contained a 50% solution of nitric acid, that there was a hole in the fence, which hole had been in existence to defendant's knowledge for from four to six months prior to the alleged accident and that "There is a hole in fence where the injured boy may have crawled through unseen."
At the time of the incident the infant was less than three years of age, having been born in June, 1953. Plaintiffs' testimony shows that on April 30, 1956 the infant had left his home for the playground at about 9:30 A.M. in the company of two other children; that he was observed on defendant's premises and was crying at the time; that he returned home at about 10:15 to 10:30 A.M., and while crying and holding his hands said to his mother, "Playground, poison, fence, poison"; that plaintiff-mother noticed an oil-like, yellow brown substance over both his hands; that she washed his hands and applied vaseline on them and thereafter took the boy to a doctor.
From the testimony the jury could have found that the boy had gained access to the defendant's premises through the above-described hole in the fence, walked an estimated 300 feet along the fence separating defendant's building and *128 the playground to the corner of the building which had the open platform upon which rested the vat; that, when he arrived at the corner of the building, he could have turned right along its front and proceeded to the other end of the open platform, thence walked up a board ramp to the platform and to the vat, and that he then put his hand or hands on and into the vat of nitric acid. Although oral testimony indicates the distance walked along the ground in front of the platform was approximately 125 feet, a photograph exhibit in evidence indicates that the distance is considerably less.
On the initial visit to the doctor he gave the boy an injection of demerol and immersed him in a tub for one hour. He was then taken to a hospital where he remained for eight days and where his arm was kept bandaged for the first two days and thereafter it was left open and some powder was applied. He was then returned home and while at home, for a two-month period, the mother had to perform an operation of about 15 or 20 minutes, twice a day. It consisted of constant rubbing of the arm with green soap and gauze "until it bled, until the dark stuff fell off" and that she then placed surgical powder and lanolin on the arm. The boy cried when she performed this function. Thereafter the boy was taken to another hospital where he remained about 28 days under the care of a doctor. When the infant returned home, his hand had to be kept bandaged for a period of nine months whenever he went outside because exposure to the sun would break down the growing tissue. While at home the boy was treated by four doctors. As a result of his contact with the nitric acid the child suffered a circumferential burn of the third degree on his right hand. The burn was around the entire wrist part of the forearm, part of the wrist and part of the back of the hand with exuberant granulations which were thick, spongy, and presented upon examination open, raw surfaces around the entire hand.
A specialist in the field of plastic surgery testified that it was necessary to resurface the raw surfaces by means of a skin graft, that the hand was prepared for grafting by continuous *129 cold saline solutions for about seven days to make it surgically clean. Thereafter, skin was cut from the boy's thigh by use of a machine and the graft applied to the hand by the use of 75 or 100 stitches. The leg did not heal well.
In order to immobilize the graft, a cast was applied from the tip of the fingers to the arm. Ten days later the cast was removed and it was discovered that 95% of the graft had taken. About two months later the doctor found that the scar at the junction of the graft and the donor site on the leg had thickened, and it was therefore necessary to have X-ray and radium treatments to help keep the scars from thickening. When the cast was removed and the boy's wrist was moved, the doctor said: "it hurt like mad." The boy had to have physiotherapy for the muscle motion of his hand, which motion was considerably regained. This doctor also pointed out certain injuries to the forehead and to the nose. He stated that nothing could be done about them.
This expert also testified that the scarring on the leg, the hand, the forehead and the nose is permanent and that the injured hand is thinner because there was a loss of tissue by the acid and the tissue will never be regained. The wrist is also thinner. Additionally, that there will always be a difference between the color of the grafted skin and the skin around it because the pigment is lost. It was his opinion that future surgery on the boy would not be advisable because the boy has a keloidal tendency and that therefore it would be dangerous to reoperate.
On cross-examination, defendant's attorney conducted a squeezing experiment on the hand. The doctor admitted that there was little difference in gripping power between the two hands. But the doctor noted that this was a test of hand power and not wrist power, since the right wrist is thinner than the left and will never grow to the same size as the normal wrist.
It might be noted that the defendant offered no medical testimony to refute the assertions with respect to the injuries and the effects thereof.
*130 Appellant contends that the trial court erred (a) in applying the doctrine of Strang v. South Jersey Broadcasting Co., 9 N.J. 38 (1952), to the facts of this case; (b) in denying its motions for judgment in its favor, and (c) in refusing to set aside the verdicts as excessive or to reduce them.
Appellant insists that the trial judge unlawfully, unreasonably, erroneously and arbitrarily extended the social trend outlined in the Strang case; that he made an assumption upon an assumption and told the jury it was legal for it to do likewise; that plaintiffs proved nothing which could lead the trial judge to conclude that there was an attraction for this infant of about three years of age when the accident occurred; and that thereby the facts herein are clearly distinguishable from the facts in the Strang case, and that the trial court's reliance on the Strang case as controlling constitutes reversible error.
Appellant points out that the trial judge throughout the trial both on the motions for dismissal and also in his charge to the jury, relied on the following cases: Cloyes v. Delaware Township, 23 N.J. 324 (1957), affirming 41 N.J. Super. 27 (App. Div. 1956); Harris v. Mentes-Williams Co., Inc., 11 N.J. 559 (1953); Strang v. South Jersey Broadcasting Co., 9 N.J. 38 (1952); Diglio v. Jersey Central Power & Light Co., 39 N.J. Super. 140 (App. Div. 1956); and Hoff v. Natural Refining Products Co., 38 N.J. Super. 222 (App. Div. 1955). Appellant conceived that the law in the above cases seemed to be settled with respect to those cases.
But it strongly denied that the law of those cases is applicable to the facts before us. It argued that there are generally three fact categories involved. It treated each one in each case as follows:

In the Strang case:
(a) As to presence on defendant's property: A six year old child entered unfenced lands of defendant and was burned by an active fire set by defendant's janitor. The janitor left the fire unattended. Defendant's premises were in a thickly *131 populated area. Defendant knew the land was used as a playground for children. Defendant had knowledge and gave acquiescence to that use.
(b) As to cause of injury: It was definitely proved to be the fire in question.
(c) As to attraction or allurement: It was the fire. Fire has attracted man and beast from the day of creation. To be attracted by fire is a primitive instinct.

In the Harris case:
(a) As to presence on premises: Next to the school property defendant was excavating and grading a church lot. Defendant-contractor afforded no safety guards to protect children from the excavation. A teacher saw the child running across the school playground towards the church property.
(b) As to cause of injury: It was definitely proved to be the fall into the excavation.
(c) As to attraction or allurement: Children from time immemorial have been attracted by holes in the ground, newly turned earth, etc. There was here a definite attraction and allurement. The Supreme Court held that a jury question was involved and that while there was no dangerous instrumentality there was a dangerous condition created as a result thereof.

In the Cloyes case:
(a) As to presence of boy on property: An open sedimentation tank resembling a swimming pool maintained by the defendant was the cause of the drowning of the boy. Defendant knew small boys got into the premises via an opening under the fence gate.
(b) As to cause of injury: It was definitely proved to be drowning in the tank for the body was found therein.
(c) As to attraction and allurement: It was an open tank with water therein. The infant undoubtedly associated this with a pool, lake or creek. Children from time immemorial *132 have been attracted by water in a pool or even in a bath tub. This attraction is as primitive as fire.

In the Healing case before us:
(a) As to presence on defendant's property: There is absolutely no proof how the Healing boy got on defendant's property. There was a general front entrance nearest to the factory platform on which a crock was located. The boy was discovered crying for an unknown reason, several hundred feet away from that platform. Plaintiffs proved no knowledge or acquiescence to allow the three year old child to come upon and use its premises. There is absolutely no proof that the premises were available or inviting for play purposes.
(b) As to cause of injury: There is absolutely no testimony and nobody knows. Everything was left by the trial judge to guess, conjecture and speculation.
(c) As to attraction or allurement: There was none whatsoever. The crock shown by the exhibits does not resemble a cooky jar, a barber pole, a ladder-like fence, a fire or a swimming pool.
Appellant concluded that the above cases relied upon by the trial court demonstrate the vast factual difference. It complains that the trial judge erred because he over-extended the rule in the Strang case and forced said rule beyond its true import and meaning.
In the Strang case, the Supreme Court said (9 N.J., at page 45):
"And the general rule of liability covers in particular trespassing children of tender years who because of immaturity are wanting in the judgment and discretion essential to their own security. * * *
Here, the presence of the child upon the land should have been anticipated, and from this derives the duty of care and protection. The basis of liability is the foreseeability of harm, and the measure of duty is care in proportion to the foreseeable risk."
The possessor of land is liable for reasonably foreseeable injurious consequences from the use of a dangerous substance on the land. Where use of instrumentality on *133 land would be highly dangerous to the personal safety of others, the common law raises a "public duty" of care commensurate with the risk of harm. The given standard of care is operative in favor of trespassers on land if the presence of the particular trespasser be discovered, or the possessor of land be aware of constant trespassing upon a particular place or a limited area and the act is likely to cause death or serious bodily harm. A possessor of land who knows, or from acts within his knowledge should know, of constant intrusions by trespassers upon a limited area of the land is liable for their bodily harm ensuing from an artificial condition on the land created or maintained by the possessor and the condition is, to his knowledge, likely to cause death or serious bodily harm to such trespassers and is of such a nature that he has reason to believe that such trespassers will not discover it, and the possessor has failed to exercise reasonable care to warn such trespassers of the condition and the risk involved.
Liability in this case rests upon the following: (a) that the trespass was known or should have been known by appellant, and (b) that appellant should have foreseen that its maintenance of the open vat of nitric acid on its premises created a potentially dangerous condition to the infant-plaintiff. Such knowledge of the trespass and foreseeability of the risk of harm places upon appellant the duty to use reasonable care for the safety of other human beings. Restatement of Torts, § 339; Prosser, Torts (2d ed), 441. In passing we note that in Genovay v. Fox, 50 N.J. Super. 538 (App. Div. 1958), Judge Conford stated this court's concurrence "to the increasingly accepted view that foreseeability in the negligence field is more appropriately allocable to the sphere of definition of duty than to that of proximate cause." And see 13 Minn. L.R. 397, 398 (1929).
The case at hand is closely analogous to the case of Wytupeck v. City of Camden, 25 N.J. 450 (1957). In that case the City of Camden maintained five electrical substations upon a large area of undeveloped land which was surrounded by a heavily populated residential area. There *134 the city's lands were long used as a play and recreation ground by adults and children of all ages. Signs posted on the fence warned persons of the danger of the high voltage at the transformers. The plaintiff-child climbed over an eight-foot cyclone fence which was erected around the electrical transformers. His foot came into contact with a high voltage line and he was seriously burned. There was no testimony that any child had ever climbed over one of these fences before this time. The court held that the jury could have found that the infant plaintiff was unaware of the danger and that the fence was so constructed as to permit of easy ascent by a nine year old boy. The court noted in passing that children have an innate urge to climb and to explore and that parents cannot be with their children always.
In view of the fact that in the present case the hole in the fence was one of long existence and was used by children and adults as a means of ingress and egress to defendant's property, a condition which defendant knew or by the exercise of reasonable care should have known, it is clear that the presence of plaintiff-infant on defendant's land was a jury issue.
Appellant also contends that a jury should not be permitted to decide the question as to the foreseeability of the presence of an infant at the vat on the platform some 300 to 400 feet away from the hole in the fence. Appellant urges that there was no proof or knowledge which could lead it to realize or anticipate that a child would travel that distance to the platform upon which rested the dangerous substance. Appellant advocates a limitation of space on the extent of the doctrine of foreseeability. In effect, appellant argues that the distance of 300 to 400 feet is beyond the territorial limits of a foreseeable zone of danger resulting from the alleged negligence of not repairing a hole in its fence. In Wytupeck v. City of Camden, supra (25 N.J., at page 462) Mr. Justice Heher for the Supreme Court stated:
"In the much-mooted case of Palsgraf v. Long Island Railroad Co., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253, 1263 (Ct. App. 1928), a 4-3 division, Cardozo, C.J., said that negligence is not *135 actionable `unless it involves the invasion of a legally protected interest, the violation of a right'; `negligence' is the `absence of care, according to the circumstances'; the `ideas of negligence and duty are strictly correlative,' citing Bowen, L.J. in Thomas v. Quartermaine, 18 Q.B.D., 685, 694, 56 L.J.Q.B. 340 (1887); negligence, like risk, is `a term of relation,' and in the abstract, `apart from things related, is surely not a tort, if indeed it is understandable at all'; negligence is not a tort `unless it results in the commission of a wrong, and the commission of a wrong imports the violation of a right'; negligence involves, he reasoned, a relation between the parties, founded upon the foreseeability of harm to the person in fact injured.
But Andrews, J., for the minority, declared:
`Due care is a duty imposed on each one of us to protect society from unnecessary danger, not to protect A, B or C alone. * * * Everyone owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others. * * * Not only is he wronged to whom harm might reasonably be expected to result, but he also who is in fact injured, even if he be outside what would generally be thought the danger zone.'"
Judge Andrews states succinctly the facts as follows:
"Assisting a passenger to board a train, the defendant's servant negligently knocked a package from his arms. It fell between the platform and the cars. Of its contents the servant knew and could know nothing. A violent explosion followed. The concussion broke some scales standing a considerable distance away. In falling, they injured the plaintiff, an intending passenger." 162 N.E. at pages 101-102, 59 A.L.R. 1258.
In the paragraph immediately following the first sentence quoted by Mr. Justice Heher from Judge Andrews' opinion we find the following:
"* * * [Negligence involves] a relationship between man and his fellows, but not merely a relationship between man and those whom he might reasonably expect his act would injure; rather, a relationship between him and those whom he does in fact injure. If his act has a tendency to harm someone, it harms him a mile away as surely as it does those on the scene." 162 N.E. at page 102, 59 A.L.R. 1259.
From our reading of the Wytupeck opinion, we gather that our court agreed with the dissenting opinion and not with the majority one. Although we might in another case disagree with the suggested distance referred to by Judge *136 Andrews, we cannot hold as a matter of law that the distance in the present case constitutes a bar to the jury's consideration of the issue of foreseeability. Imre v. Riegel Paper Corp., 43 N.J. Super. 289 (App. Div. 1957).
Despite appellant's excellent analysis of the prior cases as set forth above, we disagree with its contention that "allurement" or "attraction" is a necessary element of the cause of action. In the Wytupeck case, supra, Mr. Justice Heher stated (25 N.J. at page 464): "The ruling principle does not necessarily involve the element of allurement." See also Judge Jayne's opinion for this court in the Diglio case, supra, 39 N.J. Super. at page 146; and Harper and James, Torts, 1451 (1956). We hold that liability is bottomed upon the foreseeability of risk of harm arising out of the maintenance of a dangerous substance  in this case, the nitric acid  defendant knowing that infants were trespassing upon its premises.
Appellant also attacks the verdicts of the jury on the grounds that they were the result of mistake, partiality, prejudice or passion and that they were against the weight of the evidence. It has frequently been stated that a jury verdict is not to be set aside as against the weight of the evidence unless it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice, or passion. R.R. 1:5-3(a); R.R. 2:5; Hager v. Weber, 7 N.J. 201, 210 (1951); Melone v. Jersey Central Power & Light Co., 30 N.J. Super. 95 (App. Div. 1954); affirmed 18 N.J. 163, 170 (1955). The application of the rule also requires that we must give due consideration to the opportunity of the trial judge and jury to pass upon the credibility of the witnesses. O'Brien v. Dade Bros., Inc., 18 N.J. 457, 460 (1955). In our consideration of whether or not the verdicts are against the weight of the evidence we are guided by these stated principles. It is not our function to weigh the evidence  that function is for the jury. Flexmir, Inc., v. Lindeman & Company, 8 N.J. 602, 605 (1952).
From the testimony the trial court was justified in concluding that plaintiffs had established a prima facie case *137 and that the case as established was sufficient to go to the jury. Wytupeck v. City of Camden, 25 N.J. 450 (1957). We are not privileged to disturb the action of the trial court "unless it clearly and unequivocally appears there was a manifest denial of justice under the law." Hartpence v. Grouleff, 15 N.J. 545, 549 (1954); Gallichio v. Gumina, 35 N.J. Super. 442, 447 (App. Div. 1955), certification granted 19 N.J. 340 (1955). We find no basis for a finding that there was a manifest denial of justice.
Moreover, in view of the fact that defendant did use a solution of 50% nitric acid, which is injurious to the health and safety of and dangerous to persons who come into contact with it, in view of defendant's admission here that the child in fact came into contact with a vat containing a solution of 50% nitric acid, in view of the fact that the child was burned, and in view of the tender age of the child here involved, this case, like the Wytupeck case, is well within the established principles of responsibility of a foreseeable risk of harm. In Simmel v. New Jersey Coop Co., 26 N.J. 168 (1958), reversing and remanding 47 N.J. Super. 509 (App. Div. 1957), on a ground not relevant to this case we find:
"The duty owing by the owner or occupier of land to infant trespassers to use reasonable care under the circumstances of the case, * * * is triggered by the foreseeability of the presence of the intruder; Restatement, Torts § 339(a) and the foreseeability of an unreasonable risk of harm, Restatement, Torts, § 339(b). No inflexible rule can be set forth concerning the prophylactic measures which must be taken in a particular case. `The measure of duty is care in proportion to the foreseeable risk.' Strang v. South Jersey Broadcasting Co., supra, 9 N.J. at page 45. And, except in the clearest case, the determination of the question of whether reasonable care was exercised is for the jury." (Emphasis added)
The evidence raised issues of fact for the jury involving the fulfillment by defendant of the duty which the law has prescribed for it.
Appellant also complains about the trial court's refusal to set aside or to reduce the verdicts on the ground that the amounts were excessive.
*138 The verdict in favor of the infant-plaintiff was $30,000. We have described above the serious injuries and the painful treatments. No medical expert was called by appellant. We feel that the jury's verdict "`could rationally and dispassionately be reached by laymen on the basis of the evidence relevant to the several categories of legally recoverable damage,'" Wytupeck case, supra, (25 N.J. at page 466). The amount awarded to the infant is not such as to justify our intervention. Salvato v. New Jersey Asphalt & Paving Co., 135 N.J.L. 185, 189 (E. & A. 1947).
The jury awarded $6,500 to the plaintiff-mother. The medical expenses amounted to $1,880.15. From the testimony and the charge the jury could have determined that the permanent weakness of the right wrist and the loss of gripping power in that hand would not permit the infant to engage in certain occupations requiring a full use of the right wrist and hand. Plaintiff-mother contends that such limitations would bar her son's employment in many occupations and would restrict the financial benefit of his services to her for the next 18 years. Additionally, she contends that she should recover for the services she rendered in the twice a day scrubbing operation. She did the work rather than have someone else come into her home and do it. We find no testimony that this plaintiff lost any earnings as the result of taking time to perform this duty for her son. We cannot hold that such service is an element of recovery in her per quod action. Mathias v. Luke, 37 N.J. Super. 241, 248 (App. Div. 1955). Cf. 67 C.J.S. Parent and Child § 55, at page 760.
We are aware that the admeasurement of damages in personal injury cases is not gauged by any established graduated scale; that within reasonable limits the appraisal of the amount of damages is left to the sound discretion of the jury, and that the value of the award must be appraised in the light of existing economic conditions. Cabakov v. Thatcher, 37 N.J. Super. 249, 258 (App. Div. 1955). But no jury should be permitted to exercise vicarious generosity with other people's money.
*139 We conclude that this verdict is clearly excessive. Kress v. City of Newark, 8 N.J. 562, 576 (1952). We hold that, unless plaintiff-mother consents in an appropriate form to accept in lieu of the jury's award of $6,500 the sum of $3,000, a new trial confined solely to the assessment of damages to this plaintiff is ordered. Conklin v. Miele's Motor Transportation, Inc., 43 N.J. Super. 420, 429 (App. Div. 1957).
Modified, no costs.