71 N.J. Super. 39 (1961)
176 A.2d 280
MARY MASSOTTO, ET AL., PLAINTIFFS-RESPONDENTS,
v.
PUBLIC SERVICE COORDINATED TRANSPORT, ETC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 9, 1961.
Decided December 8, 1961.
*42 Before Judges GAULKIN, KILKENNY and HERBERT.
Mr. Louis F. Stein, Jr., argued the cause for appellant.
Mr. Samuel A. Larner argued the cause for respondents (Mr. Hyman B. Mintz, attorney).
The opinion of the court was delivered by KILKENNY, J.A.D.
In this personal injury negligence action, a jury in the Essex County Court, Law Division, returned a verdict in favor of the injured plaintiff, Mary Massotto, in the sum of $40,000, and in favor of her husband, Dominick Massotto, who sued per quod, in the sum of $1,250. Defendant's motion to set aside the verdict and for a new trial was denied.
Defendant appeals from the judgment based upon the verdict and urges six grounds for reversal.

I.
Defendant contends that the trial court erred in removing the issue of contributory negligence from the case. There had been a prior trial, at which the issue of contributory negligence had been submitted to the jury and it returned a verdict of no cause for action. On appeal, the Appellate Division reversed and remanded the case for *43 a new trial, holding that, on the record before it, the evidence was insufficient to raise a jury question as to plaintiff's contributory negligence. This court ruled on that previous appeal that "the mere act of plaintiff, in walking in the manner described from one part to another part of the moving vehicle" did not justify the court's charge that a jury question as to her contributory negligence thereby was projected. Other points raised by the plaintiffs on that appeal were not considered. Massotto v. Public Service Coord. Transport, 58 N.J. Super. 436 (App. Div. 1959).
In removing the issue of contributory negligence from the jury's consideration in the second trial, now under review, the trial court quite properly felt bound and was bound by our previous ruling, since the testimony as to the happening was substantially the same as that given at the first trial. The gravamen of the complaint was that the female plaintiff on November 8, 1957, a clear day, about 9:30 A.M., was moving from the front of the bus to obtain a seat in the rear of the bus, when the operator negligently and suddenly brought the bus to a sharp stop, and thereby caused her to be thrown to the floor of the bus with consequential physical injury.
Mrs. Massotto testified to her movement in the bus as follows, at the first trial (58 N.J. Super., at pp. 437-438):
"Q. Tell us what you did when you changed. A. I got off the seat and I was moving toward the back of the bus. All of a sudden * * *
Q. Just a minute. How were you moving toward the back of the bus? A. Facing the back of the bus.
Q. Were you walking? A. I was walking, yes.
Q. What is this? Down the aisle? A. Down the aisle.
Q. Between the cross seats? A. That's right.

* * * * * * * *
Q. Were you holding onto anything? A. Yes. I was holding as I was going up, as I was ready to grab 
Q. Just a minute. You were holding onto what? A. To the seats.
Q. Just before anything unusual occurred, what were you doing as far as your hands are concerned? A. I was trying to grab the strap at the end of the bus."
*44 Her testimony at the second trial was substantially the same, as the following passage demonstrates:
"Q. All right. And tell us what you did when you got up from your side seat? A. Well, as I got up I started holding on from one seat to the other.
Q. Holding on to what? A. To the straps of the seat and the bars, whatever they have on the bus.
Q. The bars, you say? A. Yes.
Q. I see. And how far back did you get before anything unusual happened? A. Well, I got as far as the back cross seats.
Q. Now, which seats are those when you say back cross seats? A. That's near the rear door of the bus.
Q. I see. And what were you doing? A. I was just about getting a hold of the strap."
The defendant argues that the plaintiff testified at the second trial that the bus was "going pretty fast," when she made her movement from the front to the rear of the bus, and that this additional item of testimony had not been given by her at the first trial. Her actual testimony at the second trial was as follows:
"Q. Now, do you have any idea how fast the bus was going before it made the sudden stop? A. No, I don't know, but pretty fast."
This half-negative, half-indefinite characterization of the speed of the bus must be read in the light of other, more definite testimony in the record. On cross-examination, Mrs. Massotto testified that when the bus driver "doesn't stop for any people they go real fast down that hill," but if he does stop for people "then he goes slow." Actually, as the bus driver testified, the bus had been stopped at Sunset Avenue to "pick up a person or two" and this accident happened somewhere between Sunset Avenue and Alexander Street, the next intersecting street, while the passengers who had been picked up at Sunset Avenue were in the process of walking to their seats.
It is clear that plaintiff's aforesaid testimony at the second trial as to the speed of the bus did not constitute a material or substantial difference from her testimony at *45 the first, so as to make inapplicable the previous ruling of this court that her conduct in moving from the front of the bus to the rear of the bus did not constitute sufficient evidence of contributory negligence to warrant submission of that issue to the jury.
Under the circumstances, no error was committed by the trial judge in removing the issue of contributory negligence from the case.
Defendant expresses concern that the Massotto ruling represents a departure from the principle that a passenger's contributory negligence is normally a question of fact for the jury. Burr v. Pennsylvania R.R. Co., 64 N.J.L. 30 (Sup. Ct. 1899); Rapp v. Public Service Coord. Transport, 9 N.J. 11 (1952); 52 A.L.R.2d, subsec. 3, p. 585, Anno. No such departure from the general rule was intended. At the same time, when the evidence discloses that the plaintiff was not guilty of any negligence which contributed to the happening, it is improper and unwarranted to submit the issue of contributory negligence to the jury. We said that in our previous decision and find no sound reason for altering our views in that respect, based on the record in the second trial.

II.
Defendant's second point is that the trial court erred in refusing and neglecting to charge on "Sudden Emergency." Defendant contended that as its bus was eastbound on Eighteenth Avenue, Newark, at a safe and moderate speed, after passing the intersection of Sunset Avenue, an unknown autoist travelling west at a high rate of speed swung around a double parked truck into the eastbound lane, causing the bus operator to apply his brakes suddenly to avoid a collision.
The bus driver testified that he was going "very slow," "in low gear"; that he could see three or four blocks down Eighteenth Avenue, straight and wide enough for four cars, or maybe five "if you run real close," although *46 if "you consider parking on both sides, only two lanes go through"; that he did not see the unknown auto until it was about 76 to 114 feet away on his side of the road coming westerly around the double parked truck and "it kept coming very fast"; that he made "a very sudden stop" because of the car coming directly in front of him "head-on," stopping the bus "within 15 feet"; that the oncoming car cleared the bus by "a matter of inches"; and then after being stopped "fifteen or twenty seconds" the bus continued on its way.
Defendant submitted in due time the following written requests to charge, relating to "sudden emergency":
"11. I charge you that if the operator of the Public Service bus, without any fault on his part, was confronted by a situation involving imminent peril, or by a sudden emergency created solely through the fault of another, then the law will not hold the operator (or his employer) guilty of negligence merely because the course of conduct he selected was not the very wisest. Ordinary care under the circumstances is all that is required and an honest mistake of judgment under such circumstances is not negligence in spite of the fact that the plaintiff may have been injured.
12. I charge you that if you find that the operator of the Public Service bus was exercising due care in the operation of his bus, and if you find that the application of brakes on the bus, or the sudden swerving of the bus, was made reasonably necessary by the imminence of peril due to the manner of operation of another vehicle on the highway, then your verdict should be in favor of the defendant, Public Service Coordinated Transport, even though the plaintiff may have sustained some injury." (Emphasis ours)
The trial court refused to so charge the jury "in the form presented because they spoke in terms of due care and ordinary care so far as the relationship between the defendant and the plaintiff was concerned. Whereas, as I conceive it, the rule to be applied was one of a high degree of care." (Emphasis supplied.) However, the trial court made no substitute charge particularly referring to the doctrine of "sudden emergency," deeming adequate his instruction to the jury that the issue for them to decide was whether the driver conducted himself as a reasonably *47 prudent person under the circumstances, having in mind his duty to exercise a high degree of care to his passengers. On the motion for a new trial, the trial judge summed up his position as to his charge in this respect, as follows:
"The sudden emergency doctrine is a definement [sic] of the duty to exercise reasonable care. I think in general terms it was covered although not in specific terms. I think had it been submitted in a form which took into account the high degree of care which the carrier owes, I might very well have charged it."
Requested charge number 11, with its reference therein to "ordinary care," was properly rejected. While the charge is a proper one in a "sudden emergency" case, where an ordinary motorist is involved, Clayton v. Vallaster, 118 N.J.L. 568 (E. & A. 1937), this particular verbiage, with its reference to "ordinary care," would be inadequate in the case of a common carrier. "A common carrier of passengers is charged with the duty of using a high degree of care for their safety. Spalt v. Eaton, 118 N.J.L. 327 (Sup. Ct. 1937), affirmed 119 N.J.L. 343 (E. & A. 1938)." Sibley v. City Service Transit Co., 2 N.J. 458, 464 (1949). See, too, Schreiber v. Public Service Coord. Transport, 112 N.J.L. 199, 202 (E. & A. 1934). This duty is not diminished, even in cases of a sudden emergency. Stremanos v. City of Cleveland, 77 N.E.2d 504 (Ohio Ct. App. 1947); Urban v. Minneapolis Street Railway Co., 256 Minn. 1, 96 N.W.2d 698 (Sup. Ct. 1959). Therefore, it would have been erroneous and misleading, if the trial court had given the requested charge. See Harpell v. Public Service Coord. Transport, 35 N.J. Super. 354, 364 (App. Div. 1955), affirmed 20 N.J. 309 (1956).
The trial court was justified in refusing to charge defendant's request number 12, not because it was an inaccurate statement of the law, but because it was incomplete in its failure to define "due care," or to relate it to the common carrier's duty of a high degree of care. A request to charge must contain an entirely correct and *48 complete statement of an applicable principle of law. If it is only partially correct or in the nature of a half-truth, it may properly be rejected.
Defendant argues that, even if its requests numbered 11 and 12 dealing with sudden emergency were inadequate, the trial court was under a duty to instruct the jury as to the doctrine of sudden emergency, since it had been alerted by defendant's requests, and its failure to refer specifically to this doctrine in its charge constituted reversible error. It is, of course, a trial court's duty to instruct the jury on all basic questions of law arising out of the facts of the case being tried, whether such instructions are specifically requested or not. Grammas v. Colasurdo, 48 N.J. Super. 543, 552 (App. Div. 1958).
Defendant made no objection to the charge as given, in its omission of a reference to "sudden emergency," other than to note an objection "to your Honor's refusal to charge Defendant's Request No. 11 and 12 which deals with the sudden emergency doctrine." To this the court replied:
"I have refused to charge Number 11 because it deals with ordinary care and the standard to be applied in this case is that of a high degree of care.
Number 12, I have refused for the same reason. The request deals with the exercise of due care, and as I read the cases, the driver is under an obligation to exercise a high degree of care, and for that reason I have refused to charge Number 12."
In State v. Abbott, 36 N.J. 63 (1961), our Supreme Court noted that where the defendant did not record a protest to the charge as given, but had requested a charge and did note the trial court's refusal to grant it, even though his request was erroneous, "it is plain he did not acquiesce in the trial court's version" and "the trial court was alerted to the basic problem." The court then stated:
"In such circumstances, especially when the controlling principles are complex or unsettled, it would be unreasonable to deny a review merely because a defendant failed to project a formula which squares with our concept of the true doctrine." *49 Guided by that rule, we consider "the meritorious issue," without need to advert to the "plain error" concept.
Did the trial court err in omitting a reference to the "sudden emergency" rule, as such? The trial court had told the jury that the defendant, as a common carrier of passengers for hire, was "under a duty to exercise a high degree of care for the safety of its passengers, to shield them from every danger which human care and foresight can reasonably anticipate and prevent * * *." The jury was reminded of defendant's position in these words:
"The driver testified concerning another vehicle on the road which he says forced him to make a sudden stop, and it is the position of the defendant that that was necessary and caused by the negligent operation of another driver on the highway. * * *
If you find * * * that the incident was caused by the sole negligence of the driver of the other vehicle and that the defendant driver was in no way negligent or that his negligence did not contribute proximately to the happening of the event, then you would be required to return a verdict of no cause for action."
The charge in this case, as given, was not erroneous as in State v. Abbott. Its only possible deficiency was its failure to state that when a person is confronted by a sudden emergency or iminent peril, without any fault on his part, he is not called upon to exercise "the same measured judgment as under other and more ordinary circumstances." Schreiber v. Public Service Coord. Transport, 112 N.J.L. 199, 202 (E. & A. 1934). But this is only a specific application of what the trial court did tell the jury, in explaining negligence, when it said:
"Generally speaking, a driver of a vehicle on the highway is under a duty to exercise for the safety of others that degree of care, caution and vigilance which a reasonably prudent person would exercise under the same or similar circumstances."
There is a modern view that a separate charge on "sudden emergency" is unnecessary, confusing, and should be eliminated. See Illinois Pattern Jury Instructions, Civil (1961), *50 prepared by the Illinois Supreme Court Committee on Jury Instructions, sec. 12.02, and the comment thereunder that such an instruction should not be given for three reasons: "First, it is argumentative. Second, it states a simple and obvious fact about human behavior. Third, except in the most obvious case when no juror would need to be reminded of the proposition it will probably lead to reversible error." Citing, Moore v. Daydif, 7 Ill. App.2d 534, 536-7, 130 N.E.2d 119, 121 (App. Ct. 1955); Reese v. Buhle, 16 Ill. App.2d 13, 20, 147 N.E.2d 431 (App. Ct. 1958); Minnis v. Friend, 360 Ill. 328, 337, 196 N.E. 191, 195 (Sup. Ct. 1935).
Furthermore, it is doubtful whether the facts herein give rise to the "sudden emergency" rule. It cannot be said here, as this court remarked with reference to the situation in Mijon v. Acquaire, 51 N.J. Super. 426, 443 (App. Div. 1958):
"no driver could reasonably be expected to foresee such an event happening."
Prosser, in his text on Torts, § 32, p. 138 notes:
"The `emergency' doctrine is applied only where the situation which arises is sudden and unexpected, and such as to deprive the actor of all opportunity for deliberation. * * * A further qualification which must be made is that some `emergencies' must be anticipated, and the actor must be prepared to meet them when he engages in an activity in which they are likely to arise. Thus under present day traffic conditions, any driver of an automobile must be prepared for the sudden appearance of obstacles in the street, or other vehicles at intersections, and his failure to act properly when they appear may be found to amount to negligence."
In this case the bus driver could see, for three or four blocks before the happening, that the two westbound lanes of this four-lane street were blocked by the vehicle parked at the curb and the double-parked truck. He should have reasonably anticipated the possibility of a westbound vehicle coming out around the truck onto an eastbound lane in *51 order to proceed westerly, just as much as he would expect a vehicle to cross in front of him at an intersecting street. He should have proceeded slowly and cautiously, ready to stop his bus if necessary, in a gradual manner and without any violent application of brakes. Thus, as Prosser aptly expresses it, this is not the type of "sudden emergency" normally contemplated by that rule, but a commonplace traffic problem for which the driver should have been prepared. See, too, Reese v. Buhle, supra, and Minnis v. Friend, supra.
Under all the circumstances, we find no prejudicial error in the trial court's omission to charge specifically the "sudden emergency" rule.

III.
Defendant next argues that the trial court erred "in refusing to direct a judgment in favor of defendant at the conclusion of the entire case." It maintains that the evidence failed to disclose any negligence on its part which was the proximate cause of the accident. Reliance is placed on such cases as Shay v. Camden & S. Ry. Co., 66 N.J.L. 334 (E. & A. 1901); Cox v. Scott, 104 N.J.L. 371 (E. & A. 1928); Garvey v. Public Service Coord. Transport, 136 N.J.L. 553 (E. & A. 1948); McKinney v. Public Service Interstate Transp. Co., 4 N.J. 229 (1950); Taylor v. Public Service Interstate Transp. Co., 13 N.J. Super. 125 (App. Div. 1951); Lutz v. Westwood Transportation Co., 31 N.J. Super. 285 (App. Div. 1954); and Mijon v. Acquaire, 51 N.J. Super. 426 (App. Div. 1958).
However, the Shay case held that where in an action against a street railway company for injuries to a passenger caused by collision with a wagon, there was proof from which the jury might infer the negligence of the motorman, there was no error in refusing to nonsuit the plaintiff.
In the other cited cases, there was uncontradicted proof that the carrier was not negligent in any way, so that a *52 nonsuit, dismissal, or judgment for the defendant was properly ordered.
In this case, there was evidence from which the jury could reasonably find that the bus operator was negligent, that he had failed to exercise the high degree of care for the safety of the passengers imposed by law upon common carriers. If, as he testified, he was travelling "very slow," "in low gear," with an unobstructed view for three or four blocks down this straight, wide highway, on a clear morning, then why was it necessary for him to apply the brakes so suddenly and to bring the bus to such a violent stop, causing the plaintiff to be thrown to the floor and down the aisle of the bus? Why weren't the brakes applied more gradually when he saw the oncoming car about 76 to 114 feet away, rather than in the sharp manner employed to cause a stoppage "within 15 feet"? Or was he travelling "pretty fast," as plaintiff testified, so that the emergency was partly due to his own tortious conduct? These were jury questions.
Even in a so-called emergency case, it is usually a question of fact for the jury as to whether proper care was exercised in the face of the emergency, "unless, perchance, it can elicit but one response from reasonable minds." Harpell v. Public Service Coord. Transport, supra (20 N.J., at p. 317). See, too, Mijon v. Acquaire, supra (51 N.J. Super., at p. 444); Dobrow v. Hertz, 125 N.J.L. 347, 349 (E. & A. 1940); and Urban v. Minneapolis Street Railway Co., supra (96 N.W.2d, at p. 701).
Here, reasonable minds could honestly differ as to the facts, so that the trial court's denial of defendant's motion for judgment, at the close of the evidence, was proper.

IV.
Defendant also claims that the verdict was so clearly against the weight of the evidence as to be the result of mistake, partiality, prejudice or passion. "It has frequently *53 been stated that a jury verdict is not to be set aside as against the weight of the evidence unless it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice, or passion." Healing v. Security Steel Equipment Corp., 51 N.J. Super. 123, 136 (App. Div. 1958); R.R. 1:5-3(a); R.R. 2:5. In applying the rule, due consideration must be given to the opportunity of the jury to pass upon the credibility of the witnesses. O'Brien v. Dade Bros., Inc., 18 N.J. 457, 460 (1955); R.R. 1:5-3(a); R.R. 2:5. "It is not our function to weigh the evidence  that function is for the jury." Healing v. Security Steel Equipment Corp., supra, at p. 136.
We have reviewed the record and conclude that it does not "clearly and convincingly" appear that the verdict was the result of mistake, partiality, prejudice or passion.

V.
Defendant asserts that the verdict was excessive. The argument is not pressed as to the $1,250 award in favor of the plaintiff husband, and properly so, because when we deduct Dr. Leff's bill of $679 and Dr. Weinstein's bill of $75, both chargeable to the husband, the net of less than $500 for loss of the wife's services and consortium is obviously not excessive.
The $40,000 award in favor of Mrs. Massotto appears very liberal, especially when we consider that she asked for only $25,000 in the ad damnum clause of her complaint. Under the old practice, prior to our present rules, she would have been limited to the amount demanded. That limitation does not apply in our present practice. In fact, R.R. 4:8-1, as amended, effective September 7, 1960, now provides that "where unliquidated money damages are claimed in any court, other than the county district court, the pleading shall demand damages generally without specifying the amount."
*54 The scope of our review on this issue is somewhat narrow. Damage verdicts "should not be disturbed unless they are so excessive in amount as `inevitably to give rise to the inference of mistake, passion, prejudice or partiality, and by that standard to be palpably against the weight of the evidence.'" Carlucci v. Stichman, 50 N.J. Super. 96, 98 (App. Div. 1958); Wytupeck v. City of Camden, 25 N.J. 450, 466 (1957). We may not invade the constitutional function of the jury and substitute our judgment for that of the jury as to the amount of plaintiff's damages in a personal injury action, unless the verdict is found excessive by the foregoing standard. Cabakov v. Thatcher, 37 N.J. Super. 249, 258 (App. Div. 1955). We are not authorized on appeal "to substitute our admeasurement of damages for that which appears to be a different but conscientious appraisement of the jury." Lukasiewicz v. Haddad, 24 N.J. Super. 399, 406 (App. Div. 1953). We may set aside a verdict as excessive if "the jury, from some cause, have done the defendants gross injustice. We cannot exercise this power rudely because we may think the verdict is high; we cannot convert ourselves into a tribunal of fact; the law has not invested us with that power." Somerville Easton R.R. ads. Doughty, 22 N.J.L. 495, 497 (Sup. Ct. 1850), cited in Moore v. Public Service Coord. Transport, 15 N.J. Super. 499, 505 (App. Div. 1951).
The simple inquiry is whether the jury's verdict "could rationally and dispassionately be reached by laymen on the basis of the evidence." Wytupeck v. City of Camden, supra (25 N.J., at p. 466). Our examination of the record satisfies us that the verdict, despite its possible liberality, is not so excessive. The jury had a right to believe Mrs. Massotto and her medical witnesses as to the nature and extent of her injuries and damage.
Thus, the jury could find from the testimony a wage loss of approximately $2,400. Between August and November 1957 she earned $1,243.97, or a little less than *55 $100 a week, as an average. She was out of work following the accident of November 8, 1957 until the week ending January 24, 1958, a period of about ten weeks. Then she worked until the week ending October 24, 1958, following which she was again out of work until the week ending February 6, 1959, a period of another 14 weeks. Defendant attempted to establish that these periods of unemployment were the result of seasonal slowdowns in her piecework job as a sewing machine operator. Mrs. Massotto denied this and attributed her wage loss to physical inability to work caused by the accident.
Dr. Leff, the family physician for many years, examined Mrs. Massotto on the day of the accident at her home, where he found her in bed and in pain. She was in moderate shock, pale and had a clammy skin. He observed a contusion on the right side of her face; a swelling and contusion of the right neck with a limitation of motion of the neck and head in all directions, with severe pain on moving the head to the right and left; a contusion and swelling of the right shoulder; pain and limitation of movement of the scapula and the right arm, with difficulty in raising and extending the arm; contusion and swelling of the right wrist, painful on extension and flexion; contusion of the right knee with a marked swelling above the kneecap or the patella; injury and distortion of the internal collateral ligament of that knee, with quite a bit of pain on standing, stooping or sitting; swelling and laceration with contusion of the right crest of the ilium of the pelvis; a lumbosacral strain evidenced by marked spasm of the lumbosacral group of muscles; and a contusion over the right kidney region. She complained of much pain in the back. Dr. Leff gave her an injection of opium, together with phenobarbital and aspirin by mouth, to keep her in a state of sedation to relieve her pain.
Thereafter, Dr. Leff continued to treat Mrs. Massotto over a period of three years. The kidney injury cleared up in a few weeks. Continued treatment cleared up the *56 contusions and temporary disabilities. However, Mrs. Massotto developed a bursitis in the right knee which ultimately left her with a "chronic tendonitis of the internal collateral ligament of the right knee"; the ligament on the inside "became fibrosed and lost its elasticity and became a chronic condition," which will probably produce pain. Her neck injury resulted in a traumatic osteoarthritis, according to Dr. Leff, with chronic pain, which in his opinion will continue and not improve. The injury to the lower back was finally diagnosed as a spondylolisthesis. X-rays of plaintiff's lumbosacral spine revealed a congenital abnormality described as the incomplete development of the dorsal arch. The X-rays showed a slipping forward of the fifth lumbar vertebra onto the sacrum, referred to medically as second degree spondylolisthesis. This condition, according to Dr. Weinstein, medical expert for plaintiff, "causes constant pain of a boring nature * * * that you can't get away from." He indicated that the only possible remedy is a major operation. Dr. Leff and Dr. Weinstein testified that there was a causal connection between plaintiff's injuries and the bus accident.
While defendant's medical experts maintained that a slipping of the vertebra to produce a spondylolisthesis, as claimed, was completely inconsistent with the pattern of Mrs. Massotto's conduct after the accident and that there were no objective signs which could be attributed to the spondylolisthesis, their contradictory medical opinions made resolution of the issue a matter within the domain of the jury. Evidently, the jury found a causal relation between the accident and her claimed injuries and believed that Mrs. Massotto was doomed to a future filled with continued pain and disability, in arriving at its substantial verdict upon an evaluation thereof. Perhaps, another jury might have made the quantum of award substantially less. But we cannot say that this verdict was not "rationally and dispassionately" reached on the basis of the evidence.

*57 VI.
Defendant's final contention is that the trial court erred "in permitting plaintiff's attorney to allude, in his summation, to matters not in evidence." Particular reference is made to the italicized words in the following portion of the summation, uttered while stressing the "pain" to which Mrs. Massotto would be subject in the future:
"Think of what that one word has meant and will mean in the future. Not only in a month, every day, every hour of the day. Think of the sleeplessness. That's what this word pain means in this kind of case. And not only up to now but thirty, thirty-five years from now. She has decided not to undergo an operation."
In objecting that the remark was "improper," defendant's attorney stated:
"There has been no life expectancy introduced in this case that refers to thirty, thirty-five years."
The trial court then said:
"Well, I don't know what the life expectancy is. I suppose we can refer to the table if we need to. I think it's fair comment."
When plaintiffs' attorney added, "I think the jury can consider it," the trial court directed him to "go ahead." Plaintiffs' attorney made no further reference to this expectancy factor. No further objection was made by defendant's attorney, no request was made for a mistrial, and no cautionary instruction to the jury was asked of the trial court.
The injured plaintiff was a white female, 42 years old in November 1957, when the accident occurred. Her life expectancy had not been proven, though the tables annexed to the Rules show that the life expectancy of a 42-year-old white female is 33.82 years. She was 45 years old at the time of trial in February 1961 and her life expectancy *58 then, according to the table, was 31.12 years. Thus, the comment was not false and appeared as nothing more than one man's estimate as to how long in the future this plaintiff, whose age was disclosed to the jury, might suffer. The statement was not related to any life expectancy table or uttered as a fact established by proof therefrom.
Defendant calls attention to Kappovich v. Le Winter, 43 N.J. Super. 528, 533 (App. Div. 1957), in which this court stated:
"We desire, however, to emphasize that the admission of such approved tables for the consideration of the jury should always be accompanied by cautionary instructions concerning their inconclusive import and limited significance."
However, in the matter before us, the life expectancy table was not admitted, so that the caveat in the above case is inapplicable. Also, Mrs. Massotto's physical condition had been so elaborately explained by the several medical witnesses that the innate common sense of the jurors would regard her attorney's reference to her future life span as speculative at best, probably subject to revision downward, especially if she were unwilling to undergo an operation, as her attorney stated.
While the indirect reference to her life expectancy should have been avoided in the summation, in the absence of proof thereof, and the jury allowed to make its own estimate of her remaining years based upon her known age, the comment of her attorney does not, under all the circumstances, warrant a reversal of the judgment.
Finding no sound basis for reversal, the judgment is affirmed.