**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4375-17T1

ALEXANDER S. CORTES, a
minor by his parents and natural
guardians, JOSE CORTES and
RENATA CORTES, and JOSE
CORTES and RENATA CORTES,
individually,

      Plaintiffs-Appellants,

v.

GARRARD CONSTRUCTION
GROUP, INC., HOBBY LOBBY
STORES, INC., and HOLZ AND
HENRY, INC.,

      Defendants-Respondents,

and

C KEYS LLC, STOLTZ
MANAGEMENT OF DELAWARE,
INC., and SETH PATTERSON,

      Defendants.

_____

Argued February 12, 2019 – Decided May 14, 2019

Before Judges Yannotti and Natali.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Docket No. L-1341-16.

Alfred J. Falcione argued the cause for appellants (Flynn & Associates, PC, attorneys; Alfred J. Falcione, on the briefs).

John J. Delany, III argued the cause for respondents Garrard Construction Group, Inc. and Hobby Lobby Stores, Inc. (Delany McBride, PC, attorneys; John J. Delany, III, on the brief).

David A. Semple argued the cause for respondent Holz and Henry, Inc. (McCormick & Priore, PC, attorneys; David A. Semple, on the brief).

PER CURIAM

Plaintiff Alexander S. Cortes, and his friend Seth Patterson, both sixteen-years old, trespassed onto a construction site controlled by defendants Garrard Construction Group, Inc. (Garrard) and Holz and Henry, Inc. (H&H), and took turns operating a forklift inside of a building being constructed. While Seth was driving the forklift, Alex attempted to jump off when his right leg got caught, then crushed, between the forklift and a pillar, resulting in serious injuries that required an above-the-knee amputation.

Alex, by and through his parents, Jose and Renata Cortes, and Jose and Renata Cortes individually, sued a number of defendants, including Garrard and

H&H, claiming they failed to exercise due care in controlling the construction site by insufficiently securing the site against unauthorized entry. In separate April 27, 2018 orders, the court granted Garrard's and H&H's motions for summary judgment, concluding Alex failed to establish that the defendants knew, or had reason to know, that minors were likely to trespass onto the construction site, as required under § 339(a) of the Restatement (Second) of Torts (Restatement). In a May 25, 2018 order, the court denied plaintiffs' motion for reconsideration. After reviewing the record, the parties' arguments, and the applicable legal principles, we reverse and remand for further proceedings.

## I.

The building where Alex's accident occurred was located within The Shoppes, a shopping center in Sicklerville. Defendant C Keys, LLC (C Keys) owned the shopping center and leased a portion of the site to defendant Hobby Lobby Stores, Inc., (Hobby Lobby) with the understanding that Hobby Lobby would construct a retail store on the premises. Hobby Lobby hired Garrard as its general contractor to construct the building, and C Keys hired H&H to prepare the surrounding site work.[1]

---

[1] Plaintiffs resolved their claims by way of settlement or voluntary dismissal against C Keys, Hobby Lobby, Seth Patterson, and Stoltz Management of

On the night of August 20, 2015, Alex and Seth were walking at The Shoppes in the direction of the Hobby Lobby building. According to Seth, he and Alex had "no particular agenda" that night. Seth testified that when he "saw lights on [in] and [an] opening" to the building, he and Alex decided they would "go and explore." They both walked into the building through the front entrance, and Alex stated they intended to engage in "parkour."[2]

Seth also testified that he did not recall having to remove any caution tape or any plywood behind any door frames in the entranceways when they entered the building. He also stated that he did not remember seeing any plastic wrap on any part of the door frame, nor did he have to remove any plastic before walking through the entryway.

Alex stated the building was "completely open" and did not have "any caution signs or anything like that. There was completely empty space."

Delaware, Inc., retained by C Keys to manage the shopping center, prior to the court's April 27, 2018 and May 25, 2018 orders. They have not participated in this appeal.

[2] Parkour is an activity similar to free running, the general objective of which is to get from point A to point B in a creative, efficient manner. See Randall Bezanson & Andrew Finkelman, Trespassory Art, 43 U. Mich. J.L. Reform 245, 262-68 (2010). In a statement to the police, Alex described it as "climbing over things, jumping over things, stuff like that."

Further, Alex testified that "if those [caution signs or anything like that] were in place, we wouldn't have ever gone into that building in the first place."

After entering the building, Alex and Seth found a ladder and climbed onto the roof, looked out over the Atlantic City Expressway, then went back down the ladder into the building. According to Alex, they were about to leave when "Seth saw the forklift. So, out of curiosity [Seth] walked over to it and he said the keys were in the forklift." As Seth put it: "I just walked up. I sat down in it. And the keys were just right in the ignition." Seth also stated he would not have searched for the keys if they were not in the ignition. Both minors drove the forklift before Alex's injury occurred, and Alex admitted that he knew it was wrong to use another person's property without permission.

According to Sean Reagan, Garrard's superintendent for the project, there was no glass in the storefront door frames the day of the incident. Reagan also testified that fencing was not in place around the whole site, and admitted it was "odd" that a chain link fence was not set up around the entire site to secure it. Reagan stated, however, that "we secured the building so that anyone -- child, adult, juvenile or whatever -- would know the danger of going into that building" by "barricad[ing]" the door frames with caution tape and plastic.

A-4375-17T1

Reagan acknowledged that the "unauthorized or unwise use of a forklift" can result in personal injury and loss of life. Further, Reagan, who was the last person to leave the Hobby Lobby building on August 20, 2015, testified that "best practices dictates that you do not leave keys in equipment." Reagan admitted that leaving keys in the ignition of a forklift after hours of operation on a construction site would be a breach of Garrard's safety policies and procedures. Reagan stated that it was his responsibility to maintain and secure the forklift that was inside the building. He repeatedly testified that when he left that night, he did not leave the keys in the ignition. In a police report of the incident, Reagan stated the key to the forklift "was believed to be hidden on the forklift by the operator," which "Re[a]gan state[d] is common practice[]."[3]

During discovery, Garrard produced its safety manual. Under a sub-heading entitled "Children and Construction," the manual provides:

> Most construction sites are like oil and water for children; they don't mix. Conversely, like iron and a magnet, children are attracted to any type of construction. Children like to explore.

---

[3] At his deposition, Reagan testified that he recalled "putting the key into a locked premises" on the night of the incident, specifically "on top of a hot water heater behind a locked hollow metal door."

6

Garrard's manual also notes that "[c]hildren don't recognize hazards as well as those who work on site . . . . All excavations are potential forts or swimming pools. Scaffolds become gym sets." In addition, the manual instructs its workers to "[r]emember: [m]ost children will respect the builder's wishes and stay out. But some will not and those are the ones that can get hurt or hurt your project from a vandalism standpoint." The safety manual further recommended that to "[d]iscourag[e] children":

> Don't allow children on site during the day. Erect a
> fence. . . . Group and lock up equipment at night. Post
> 'No Trespassing' signs. Ask for regular police patrols
> to check out your jobsite. If necessary, post a guard.

Thomas Mullinax, Garrard's project manager, testified that he was aware the site was located in an active shopping center occupied by ongoing businesses. Mullinax admitted he knew that from "June through early September," teenagers are not in school. In addition, he stated that Garrard's responsibility for the site was limited to the building's footprint and five feet outside of the footprint.

Tim Wright, Garrard's Director of Construction, stated that the project was valued between one and two million dollars, and Garrard's safety budget was $300. Wright stated he was not aware the construction site was located near an active shopping center, and he did not visit the site before the accident. Wright

7

acknowledged, however, that if he had visited the site, and saw there was no wire fencing around it, he "probably would have asked" the site contractor why there was no fencing "especially if it was, you know, in a shopping center." When asked "[w]hat about [the site] being in a shopping center would make you want to ask a question like why isn't this fenced in," Wright testified:

> Most of my concern, quite honestly, is toddlers and little kids running away from mom, possibly getting hurt in a footing or, you know, if there's stakes in the ground. . . . [I]f I got a soft spot in my heart, it's for little kids that could get injured not knowing where they're going.

According to Gerald Heulitt, H&H's project superintendent, H&H's "scope of work" for the project "started [five feet] outside the building" and extended outwards. Heulitt testified that there were "Road Closed" signs, "Keep Out" signs, orange safety fencing, and traffic cones on H&H's portion of the property on August 20, 2015. Heulitt admitted he was aware that the site was located in a shopping center with active businesses. In addition, Heulitt sent an e-mail to other H&H employees on December 1, 2016, which attached a photograph of the building taken the day after the incident, and in which Heulitt stated showed "better views [of] how unsecure the building was."

James Lennon, H&H's project manager, was also aware that the construction project was in an open and active shopping center, where people

would be driving and walking. Lennon testified that orange safety fencing, barrels, and caution tape were not considered "barricades" pursuant to H&H's safety manual. Thus, Lennon conceded that H&H did not put "any barricades up" according to its own safety manual. Lennon also conceded he was aware that a construction site is attractive to minors, and that young boys "would be attracted to the shopping center." In addition, Lennon testified that based on his experience at the construction site, the Hobby Lobby building was unsecured because "[v]isually you can see the front of the building open."

According to defendants, both Alex and Seth initially fabricated the facts regarding their entry into the building and the cause of the accident. In this regard, defendants rely upon a police report authored by Detective Michael Leach. According to the report, Seth claimed a third person let Alex and Seth into the building, and Alex was injured when a piece of rebar impaled his leg. Alex admitted at his deposition that he provided a similar account of the accident to medical staff who treated him for his injury, and to his mother the first time they discussed the incident.

Detective Leach's police report initially concluded that "it [was] unknown how [Seth and Alex] gained access into the business." However, Leach testified that he determined the minors "used [a] rebar to pry the door open to get inside,

and they carried the rebar inside with them." Further, when Detective Leach was asked whether he was "able to walk onto the Hobby Lobby site without any restrictions," he testified, "[c]orrect, I went right underneath the caution tape."

Leach also stated there was "no wire fencing" around the construction site, "just barrels," and there was no fencing that restricted his pathway to walk up to the building. When asked about the police report he authored, which stated there was an orange vinyl construction fence with "Keep Out" signs attached to poles surrounding the building, Leach testified that the fencing was "not around the entire property" as he was able to walk onto the property without having to traverse that fencing.

During discovery, plaintiffs produced the expert report of Stephen A. Estrin and Joshua M. Estrin, Ph.D. The Estrins opined that as construction contractors, Garrard and H&H must "first obtain their knowledge of the site during the project's [b]id [p]hase, during a site visit." According to the Estrins, "[i]t is at this point in the construction process that a site evaluation takes place and that evaluation must include a Life/Safety Exposure Analysis ('LSEA') which is essential to the development of the project site security policy and plan, which is to be made part of the Project Site Specific Safety Plan." The Estrins

noted that the LSEA "should identify both the macro and micro communities" surrounding the site.

The report further provided that the construction site had two communities, "a macro community comprising [a] surrounding residential development," which was a "residential neighborhood including families with teenagers," and "a micro community of an active shopping center, both of which were generators of vehicular and pedestrian foot traffic during and after construction hours." The Estrins opined that this "construction jobsite was unique" because its particular micro and macro communities "engendered the need for extra planning, precautions, communication and an overall heightened awareness of the increase in safety/security risks associated with the general public . . . ."

Accordingly, the Estrins concluded that the construction site "required a physical barrier controlling access to the overall jobsite as well as the Hobby Lobby store under construction . . . , in the form of a total perimeter eight (8') foot high metal fencing with a single entrance/exit point, secured with a locking gate." With respect to the building itself, the report stated:

> it was further necessary for that portion of the jobsite
> to have a Site Security Plan which specified that the
> building be secured, specifically the vestibule entrance
> doors, by framing out the area directly behind the

unglazed doors with metal studs, covered in one-half (1/2") inch CDX plywood, having a single entrance/exit point in the wall, a doorway, secured by a lock and posted with the signs shown on pages [four] and [sixteen] of this [r]eport.[4]

In addition, plaintiffs' experts reviewed Reagan's deposition testimony and concluded that his testimony showed that Reagan was "aware of the need for increased diligence regarding safety, as this construction site under his supervision was in close proximity to both a residential neighborhood and an active shopping center, putting the construction site at greater risk of increased 'traffic' by teenagers and in turn their inherent, natural curiosity . . . ."  Further, they opined that "a seminal fact in understanding this accident" is that "had the keys not been in the ignition, Alex . . . would not have suffered his catastrophic injury."

H&H also submitted an expert report authored by Timothy J. Carlsen.  In contrast to plaintiffs' experts' report, Carlsen opined that "[t]emporary chain-link or similar fencing" around the perimeter of the site was not required by the project site plans that were approved for construction, any contract entered into

---

[4]  The sign on page four of the report states that "[c]hildren must not play on this site," and the sign on page sixteen states, underneath the word "danger" in all capital letters: "Stay out! Stay alive!"

by H&H, or any applicable building code or ordinance, and that "H&H did not require chain link fence to meet its security needs."

On April 27, 2018, the court heard oral arguments and issued separate orders granting both Garrard's and H&H's motions for summary judgment. In its oral decision issued that day, the court concluded that plaintiffs failed to satisfy their burden under § 339 of the Restatement, which provides that "[a] possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if":

(a)    the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b)    the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c)    the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d)    the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

>    (e)    the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.
>
>    [Restatement (Second) of Torts § 339 (Am. Law Inst. 1965).]

Specifically, the court determined plaintiffs failed to satisfy § 339(a) because there was "nothing in the record" that showed "either Garrard or H&H had actual knowledge or had constructive knowledge or had any knowledge that there had been trespassers to that site, whether adult or children," prior to the accident, which the court found was "fatal" to plaintiffs' case against either defendant. However, the court concluded that plaintiffs "would meet [their] burden with respect to" the remaining elements "as to Garrard," but the court was "not satisfied that the plaintiff would meet its burden" under § 339(b) or (c) as to H&H.

Plaintiffs filed a motion for reconsideration and argued that the court overlooked and misapplied factual evidence regarding how Seth and Alex entered the building, applied an incorrect standard of liability under § 339 by requiring knowledge when the Restatement requires only "reason to know," and mistakenly relied on inapplicable case law in granting summary judgment.

At a May 25, 2018 hearing, the motion judge clarified that when he stated plaintiffs failed to satisfy § 339(b) and (c) of the Restatement as to H&H in its

April 27, 2018 oral decision, the court "didn't mean" § 339(c). The judge

elaborated that, as to Garrard, if "I got over [§ 339](a), I would have found the

plaintiff[s] had satisfied (b), (c), and (d)," and with respect to H&H, "I think that

[§ 339](b), which is the dangerous condition, [H&H] was not aware of it, I think

I would not have found that. But I didn't get there."

After counsel for H&H sought further clarification, the court explained:

> I mean, if it becomes an issue, I'll clarify the record.
> But I've got to tell you, in fairness to all parties,
> including the plaintiff[s], . . . I did not set forth a real
> factual basis for (b), (c), or (d). I kind of gratuitously
> threw that out, but I was convinced then and I'm
> convinced now that the (a) element as it is applied
> under the Restatement, they can't satisfy. And the law
> is they have to satisfy each of those elements.
>
> When they couldn't get to (a), I kind of -- I mean, I had
> (b), (c), and (d) prepared, but it was . . . to my thinking,
> meaningless. . . . [I]f I'm directed to supplement the
> record, I'll do that, . . . I was prepared to do it today, but
> I don't think it's fair because the parties were not
> prepared to argue that and my ruling hadn't changed on
> it.

The court entered an order that day denying plaintiffs' motion for

reconsideration. This appeal followed.

II.

On appeal, plaintiffs assert the trial court committed error because it

misapplied the appropriate legal standard when assessing liability for minor

A-4375-17T1

trespassers under § 339(a).  Specifically, plaintiffs maintain the summary judgment record created a genuine and material factual dispute regarding whether Garrard and H&H had "reason to know" that minors were likely to trespass on the construction site.  We agree.

We need not discuss at length the principle that courts reviewing summary judgment motions must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); see also R. 4:46-2(c).  Although the non-moving party must have "more than a scintilla of evidence" in its favor to defeat the motion, Pressler & Verniero, Current N.J. Court Rules, cmt. 2.1 on R. 4:46-2 (2019), the court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).  We review summary judgment rulings de novo, under the same standard governing the motion judge's initial decision.  Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016).

Section 339 of the Restatement "is an exception to the common–law rule immunizing [a] possessor of land from liability resulting from injury to the trespasser, absent willful or intentional conduct." Vega by Muniz v. Piedilato, 294 N.J. Super. 486, 492 (App. Div. 1996), aff'd, 154 N.J. 496 (1998).[5] Section 339(a) required plaintiff to establish that defendants knew or had "reason to know" children were likely to trespass into the building where the forklift was located. See Callahan v. Dearborn Devs., Inc., 57 N.J. Super. 437, 442 (App. Div. 1959) (explaining "the defendant must have reason to anticipate the presence of the child at the place of danger" and that when "any such reason is lacking, there is no duty to look out for [a trespassing child], and no liability") (emphasis omitted) (quoting Prosser, Trespassing Children, 47 Cal. L. Rev. 427, 448 (1959)).

A person has "reason to know" when he or she "has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his [or her] conduct upon the assumption that such fact exists." Restatement (Second) of Torts § 12(1) (Am. Law Inst. 1965). Thus, a defendant

---

[5] Neither Garrard nor H&H dispute that they are possessors of land under the Restatement, although H&H argues that it was not in control of the specific land where the forklift was located.

"must have reason to anticipate the presence of the child at the place of danger," W. Page Keeton et al., <u>Prosser and Keeton on Torts</u> § 59 at 404 (5th ed. 1984), or, in other words, the trespass must be reasonably foreseeable. <u>See</u> <u>Simmel v. New Jersey Coop. Co.</u>, 28 N.J. 1, 9 (1958); <u>Lorusso v. De Carlo</u>, 48 N.J. Super. 112, 115 (App. Div. 1957).

Here, we conclude that genuine and material factual questions existed as to whether Garrard had "reason to know" that children would trespass into the Hobby Lobby building. Viewing the testimony of Seth, Alex, Detective Leach, Thomas Mullinax and Sean Reagan in the light most favorable to plaintiffs, a reasonable factfinder could conclude that the area was insufficiently secured to prevent minors from entering the construction site and the illuminated Hobby Lobby building. Further, Mullinax acknowledged that he was aware that The Shoppes was an active shopping center, with businesses open to the public, including teenagers like Seth and Alex. In addition, plaintiffs' experts opined that the site's close proximity to both a residential neighborhood and an active shopping center placed the site at greater risk of increased "traffic" by teenagers.

Finally, we cannot ignore the statements in Garrard's safety manual, which recognized that minors had a magnetic attraction to construction sites. When the totality of the summary judgment record is viewed through the prism of those

18

disclosures, we conclude sufficient factual questions existed in the motion record to defeat summary judgment for Garrard under § 339(a).

We reach a similar conclusion with respect to H&H. First, Gerald Heulitt and James Lennon, H&H's project superintendent and manager, were aware that the site was located in an open and active shopping center. In this regard, Lennon testified that juveniles and young boys "would be attracted to the shopping center," that a construction site is attractive to minors, and that the building was unsecured because "[v]isually you can see the front of the building open." This testimony, combined with plaintiffs' experts' opinions, that the site was "unique" based on its shopping-center micro community and residential-neighborhood macro community, was sufficient to defeat summary judgment under § 339(a), as a reasonable factfinder could conclude that H&H had reason to know minors were likely to trespass onto the site. See Wytupeck v. City of Camden, 25 N.J. 450, 454-64 (1957) (holding it was reasonably foreseeable that a minor would trespass upon a portion of the defendant's fourteen-acre tract of land enclosed by an eight-foot tall steel fence with a locked and chained gate, and which had not been trespassed upon before, because adults and children frequently used another portion of the tract for recreational activities); Prosser and Keeton, § 59 at 404-05 (footnotes omitted) ("past trespasses, proximity to

places where children are likely to be, accessibility of the dangerous condition, or any other evidence or aspect of the situation which would lead a reasonable person to anticipate the trespass" are proper bases upon which to find a defendant had reason to know children were likely to trespass).

Defendants argue that the decisions in Long v. Sutherland-Backer Co., 92 N.J. Super. 556, 558-60 (App. Div.) (Kolovsky, J., dissenting), rev'd on dissent, 48 N.J. 134 (1966), and Callahan compel a contrary result. We disagree, as both cases are factually distinguishable.

In Long, a minor was killed after he entered the defendant's property with his friends and attempted to move a cement mixer, which toppled over and crushed him. Long, 92 N.J. Super. at 557. In our majority opinion, we affirmed the jury's verdict in plaintiff's favor, concluding that "the evidence made out a jury question of defendant's liability within the requirements of section 339 of the Restatement of Torts." Ibid. The Supreme Court reversed for the reasons expressed in Judge Kolovsky's dissenting opinion. 48 N.J. at 135.

In that case, the defendant's property was located between a dairy and a union hall, and "was enclosed in part by the wall of [a] shed . . . , the remainder by a fence at least five feet ten inches high with pickets on top." Long, 92 N.J. Super. at 558-59 (Kolovsky, J., dissenting). Judge Kolovsky's dissent concluded

20

that although the plaintiff's companions testified that they had entered the property through a hole in the shed "on several occasions during the two-week period preceding the accident," there was "no evidence from which it may be inferred that defendant knew or should have known that children had been in the shed or yard on prior occasions, or that it was likely that they would trespass." Ibid.

Here, rather than a hole in the wall of a shed partially securing property located next to a dairy and a union hall, the entrance to the Hobby Lobby building was, according to Alex and Seth, "completely open" and unobstructed, and situated in an active shopping center near a residential neighborhood. As H&H's project manager conceded, juveniles and young boys "would be attracted to the shopping center," especially so in August when, as Garrard's project manager admittedly knew, teenagers were not in school.

Callahan is similarly distinguishable. In that case, we held that a defendant "constructing a multiple housing development" could not reasonably foresee that a child would trespass into a house by using a ladder to climb through a window twelve feet above ground level, then unlock from the inside "a door which defendant had taken the precaution to lock, and admit other children to the building." Callahan, 57 N.J. Super. at 439-40, 442. We further

21

concluded that it would "make 'foresight' synonymous with 'omniscience'" to hold that the defendant should have known "that, having entered, the children would place in motion and operate an electric saw and by their own acts create a 'place of danger.'" Id. at 442.

We note that the houses at the construction site in Callahan "were in various stages of completion" and "defendant's only knowledge of the prior presence of children on any part of the premises was that on occasion they played on [a] topsoil pile" located "on the exterior of the premises." Id. at 439, 442. After the minors "wandered into the development area" and entered the "completely framed" house at issue, they found "an electric chain saw . . . on a work table, located a switch" underneath the table, "and set the saw in motion." Id. at 440. After attempting to cut a board with the saw, the minor plaintiff "severed one of his fingers and injured another." Ibid.[6]

---

[6] We acknowledge that the Callahan court refused to impose liability under § 339(a), in part, because the minors created the "place of danger" by setting the saw in motion. Id. at 440, 442. However, the court's discussion under § 339(d) demonstrates that its § 339(a) analysis was influenced by the minors' "boundless ingenuity" in that "[t]he locked door . . . presented no barrier to their entrance," which made it "doubtful indeed that they would have experienced any hesitancy in searching the premises until they found the source of the electrical supply." Id. at 444. Here, Seth testified that the building's entryway was totally unobstructed, the key was in the ignition to the forklift, and he would not have searched for the key if it was not in the ignition. As plaintiffs' experts opined,

Here, according to Alex's and Seth's deposition testimony, they did not encounter any barrier to entering the Hobby Lobby building, let alone a locked door, and only climbed a ladder once they were inside the building, as opposed to using a ladder to gain entry through a window twelve feet above ground level. Further, a reasonable inference from the conclusions detailed in plaintiffs' experts' report is that a partially developed area, where the defendant's knowledge of the presence of children was limited to a topsoil pile exterior to the premises, is a different micro-community than an active shopping center with operating businesses open to the public.

Finally, defendants request that in the event we reverse the court's determination regarding § 339(a), we should nevertheless affirm the April 27, 2018 and May 25, 2018 orders by finding that no material factual issues exist with respect to §§ 339(b) to (e). Although we acknowledge that "appeals are

---

"a seminal fact in understanding this accident" is that "had the keys not been in the ignition, Alex . . . would not have suffered his catastrophic injury." Further, in <u>Scheffer v. Braverman</u>, 89 N.J. Super. 452, 458 (App. Div. 1965), we recognized that the question whether an artificial condition on land is "of such character as likely to cause an unreasonable risk of serious bodily harm" falls "within the true meaning of section 339(b) of the Restatement of Torts." As we discuss <u>infra</u> at pp. 23-24, here, the court based its summary judgment ruling exclusively on § 339(a), and expressly made no factual findings as to the remaining <u>Restatement</u> factors, including § 339(b). Nothing in our opinion precludes any party on remand from seeking summary judgment on any of the remaining <u>Restatement</u> factors.

taken from orders and judgments and not from opinions," Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001), we decline to invoke our original jurisdiction to make the factual findings necessary to affirm the April 27, 2018 and May 25, 2018 orders. See Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C., 441 N.J. Super. 369, 384-85 (App. Div. 2015) (declining to "exercise original jurisdiction and address" whether plaintiff's claims were excluded under an insurance policy when the motion judge "never reached those issues"), aff'd, 226 N.J. 403 (2016).

As noted, in its May 25, 2018 oral decision denying plaintiffs' reconsideration motion, the court clarified that its decision to grant summary judgment was based exclusively upon § 339(a). As we have repeatedly observed, our "original jurisdiction should be exercised with 'great frugality' and not when there is a need to 'weigh[ ] evidence anew' or 'mak[e] independent factual findings[.]'" Id. at 385 (alterations in original) (quoting State v. Micelli, 215 N.J. 284, 293 (2013)); see also Duddy v. Gov't Emps. Ins. Co., 421 N.J. Super. 214, 221 (App. Div. 2011) (declining to decide "in the first instance" a question not addressed by the trial court). Accordingly, we conclude it is appropriate for the trial court in the first instance to address whether material factual issues exist under §§ 339(b) to (e).

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION